Appeal Nos. 15-1165, -1201

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

TRANSPERFECT GLOBAL, INC., TRANSPERFECT TRANSLATIONS
INTERNATIONAL, INC., TRANSLATIONS.COM, INC.,

*Plaintiffs-Cross-Appellants,*

v.

MOTIONPOINT CORPORATION,

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 4:10-CV-02590-CW,
HONORABLE CLAUDIA WILKEN, UNITED STATES DISTRICT JUDGE

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## MOTIONPOINT CORPORATION

ROBERT W. STONE
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000

AMY H. CANDIDO
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600

RICHARD W. ERWINE
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant-Appellant*

February 25, 2015

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant MotionPoint Corporation certifies the following:

**1.    The full name of every party or amicus represented by me is:**

MotionPoint Corporation.

**2.    The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

None.

**4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this Court are:**

QUINN EMANUEL URQUHART & SULLIVAN, LLP:  Charles K. Verhoeven; Robert W. Stone; Richard W. Erwine; Amy H. Candido; Matthew D. Robson; Gregory C. Wyckoff; Meghan E. Bordonaro; Emma E. Mann-Meginniss; and Zachariah B. Summers.

MCDERMOTT WILL AND EMERY, LLP:  Philip Ou; Joel M. Freed; Alexander P. Ott; Edwin H. Wheeler; Anthony R. de Alcuaz; and Isaac Crum.

KERR & WAGSTAFFE, LLP:  Adrian J. Sawyer.

Respectfully submitted,

Dated:  February 25, 2015     By:  _____*/s/ Robert W. Stone*_____
Robert W. Stone
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100
robertstone@quinnemanuel.com

*Attorney for Defendant-Appellant
MotionPoint Corporation*

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF ABBREVIATIONS ................................................. xi

STATEMENT OF RELATED CASES ....................................... xii

JURISDICTIONAL STATEMENT ............................................. 1

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF THE ISSUES .................................................. 5

STATEMENT OF THE CASE ..................................................... 7

    A.    The Patent At Issue .................................................. 7

    B.    Procedural History and the District Court's Findings ............. 11

SUMMARY OF ARGUMENT ................................................. 13

STANDARD OF REVIEW ....................................................... 16

ARGUMENT ........................................................................ 17

I.    THE DISTRICT COURT ERRED BY NOT GRANTING
    JMOL OF NO DIRECT INFRINGEMENT, IGNORING
    THAT MULTIPLE PARTIES ARE REQUIRED TO
    PRACTICE ALL CLAIM ELEMENTS ............................................ 17

    A.    The District Court Erred in Finding That MotionPoint
        Performed The "Clicking" Step of Claim 11 ........................... 18

        1.    MotionPoint Is Not Liable For The Acts Of
            Internet Users ................................................ 19

        2.    The District Court Erred In Adopting A Post-Trial
            Infringement Theory For Which There Exists No
            Record Evidence ............................................ 23

          (a)    TransPerfect's Experts Confirm The Lack
Of Evidence Related To Customer
Demonstrations ..................................................... 24

          (b)    The District Court's Finding Is Premised On
A Misstatement Of The Record .......................... 26

  B.    The District Court Erred in Finding That MotionPoint
Performed The "Displaying" Step of Claim 11 ...................... 28

  C.    The District Court Erred in Finding That MotionPoint
Provides the "Single Action Translation Component" of
Claim 17 ..................................................................................... 29

      1.    Alleged "Use" By MotionPoint ..................................... 31

      2.    Alleged "Making" and "Selling" By MotionPoint ........ 35

II.  THE DISTRICT COURT ERRONEOUSLY CONSTRUED
THE TERM "OBTAINING A TRANSLATION" ........................... 36

  A.    The Specification Requires The Ability to Create New
Translations ............................................................................. 37

  B.    Disclosures Relating To "Caching" Do Not Support The
Court's Construction ............................................................... 38

  C.    The '022 Prosecution History Belies the Court's
Construction ............................................................................ 39

  D.    Under the Proper Construction, MotionPoint Does Not
Infringe ................................................................................... 40

III.  THE DISTRICT COURT ERRED IN FAILING TO FIND
CLAIMS 26 AND 27 INDEFINITE FOR LACK OF
CORRESPONDING STRUCTURES ................................................ 40

  A.    Section 112 Legal Principles ..................................................... 42

  B.    The Specification Discloses No Structure for "Receiving
an Electronic Communication" ................................................ 44

C. Even if the "Receiving" Function Was Performed By Software, The Specification Fails to Disclose Any Algorithm ............................................................................. 46

D. The Specification Discloses No Structure for "Returning A Translation of Said Electronic Communication" ................. 48

E. The Specification Discloses No Structure for "Returning A Translation of Said Further Electronic Communication" ....................................................................... 50

F. TransPerfect's Post-Trial "HTTP" Construction Was Not Before The Jury and Would Necessitate Vacating Infringement ........................................................................... 52

IV. THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING AN INJUNCTION ........................................................ 56

A. TransPerfect Cannot Avoid This Court's Precedent Requiring A Causal Nexus Between The Infringing Conduct And Any Irreparable Harm ........................................ 57

1. The District Court Erred By Relying on Evidence Insufficient as a Matter of Law Under *Apple II* and *Apple III* ......................................................................... 58

2. The District Court Made Clearly Erroneous Factual Findings ........................................................... 62

3. Under the Correct Legal Standard, TransPerfect Failed to Show a Causal Nexus and the Injunction Should Be Vacated ........................................................ 64

B. The District Court Erred By Finding that TransPerfect Will Suffer Irreparable Harm Merely Because the Parties Are Competitors ...................................................................... 66

C. The District Court Erred In Finding That Monetary Damages Do Not Provide Adequate Compensation ................ 68

D. The Balance of Hardships Does Not Support an Injunction .............................................................................. 69

1.    TransPerfect Will Not Suffer Any Significant
      Hardship In The Absence Of An Injunction.................. 69

2.    MotionPoint Is Suffering Substantial Hardship
      From The Injunction ...................................................... 70

CONCLUSION............................................................................................ 71

ADDENDUM

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  695 F.3d 1370 (Fed. Cir. 2012) ..................................... 16, 59, 69, 60, 61

*Apple Inc. v. Samsung Elecs., Co., Ltd.*,
  735 F.3d 1352 (Fed. Cir. 2013) ............... 16, 57, 58, 59, 62, 64, 65, 68, 69

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ..................................................... 43

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013) ............................................ 18, 21, 27, 28

*BMC Resources, Inc. v. Paymentech, L.P.*,
  498 F.3d 1373 (Fed. Cir. 2007) ..................................................... 29

*Biomedino v. Waters Tech.*,
  490 F.3d 946 (Fed. Cir. 2007) ..................................................... 56

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ............................................ 43, 54, 55

*Centillion Data Sys., LLC v. Qwest Comm'n Int'l, Inc.*,
  631 F.3d 1279 (Fed. Cir. 2011) .................................................. 31-33, 35

*Centricut, LLC v. Esab Group, Inc.*,
  390 F.3d 1361 (Fed. Cir. 2004) ..................................................... 24

*In re Cuozzo Speed Techs., LLC*,
  2015 WL 448667 (Fed. Cir. Feb. 4, 2015) ............................................ 17

*Deepsouth Packing Co. v. Laitram Corp.*,
  406 U.S. 518 (1972) ..................................................... 30

*Desenberg v. Google, Inc.*,
  392 F.App'x. 868 (Fed. Cir. 2010) ..................................................... 21

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ..................................................... 17, 56, 57, 67, 68

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ..................................................... 42

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012) ..................................................... 42, 46, 47, 49, 53

*Finisar Corp. v. DirectTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) ...................................................... 43

*Golden Hour Data Sys., Inc. v. emsCharts, Inc.*,
614 F.3d 1367 (Fed. Cir. 2010) ...................................................... 23

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990) ...................................................... 67

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ................................................ 17, 66

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
734 F.3d 1352 (Fed. Cir. 2013) ...................................................... 16

*Keithley v. Homestore.com, Inc.*,
636 F.Supp.2d 978 (N.D.Cal. 2008) .............................................. 22

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
498 F.Appx. 986 (Fed. Cir. 2013) .................................................. 55

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ...................................................... 47

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
248 F.3d 1303 (Fed. Cir. 2001) ...................................................... 50

*Muniauction, Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008) ............................................ 17, 19-22

*NetMoneyIN Inc.  v. VeriSign Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ................................................ 43, 44

*Noah Sys. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012) ...................................................... 54

*PA Advisors, LLC v. Google, Inc.*,
706 F.Supp.2d 739 (E.D.Tex. 2010) .............................................. 21

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
457 F.3d 1284 (Fed. Cir. 2006) ...................................................... 43

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ...................................................... 69

*Robert Bosch, LLC v. Snap-On Inc.*,
769 F.3d 1094 (Fed. Cir. 2014) ...................................................... 45

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
215 F.3d 1246 (Fed. Cir. 2000) ...................................................... 35

*Smith & Nephew, Inc. v. Interlace Med., Inc.*,
955 F.Supp.2d 69 (D. Mass 2013) ................................................ 70

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)................................................................... 25

*Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*,
    135 S.Ct. 831 (2015).......................................................... 16, 44

## **Statutes**

28 U.S.C. § 1295(a)(1)....................................................................1

28 U.S.C. § 1331............................................................................1

28 U.S.C. § 1338............................................................................1

35 U.S.C. § 112, ¶6................................................ 4, 42, 43, 45, 56

35 U.S.C. § 112, ¶1.................................................................... 70

35 U.S.C. § 112, ¶2.................................................................... 70

35 U.S.C. § 271(a) ................................................................. 30, 35

FED. R. CIV. P. 50(b) ................................................................. 12

FED. R. CIV. P. 59 ..................................................................... 12

## **TABLE OF ABBREVIATIONS**

| | |
|---|---|
| A_____ | The cited page(s) of the Joint Appendix |
| '022 patent | U.S. Patent No. 6,857,022 |
| Apple II | *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370 (Fed. Cir. 2012) |
| Apple III | *Apple Inc. v. Samsung Elecs., Co., Ltd.*, 735 F.3d 1352 (Fed. Cir. 2013) |
| CBM | Covered Business Method |
| Dkt. | Entry from the district court docket for *TransPerfect Global, Inc. et al. v MotionPoint Corp.*, Case No. CV-10-02590-CW (N.D.Cal.) |
| JMOL | Judgment as a Matter of Law |
| MotionPoint | Defendant-Appellant MotionPoint Corporation |
| PTAB | Patent Trial and Appeal Board |
| Tr. | Citation to the Trial Transcript |
| TransPerfect | Plaintiffs/Cross-Appellants TransPerfect Global Inc., TransPerfect Translations International, Inc., and Translations.com, Inc. |
| USPTO | United States Patent and Trademark Office |

## <u>STATEMENT OF RELATED CASES</u>

No other appeal from this civil action was previously before this Court or any other appellate court.  There is no case pending in this Court or any other court that will directly affect or be directly affected by the Court's decision here.  There are no other cases related to this dispute.

The TransPerfect patent-at-issue in this appeal –  U.S. Patent No. 6,857,022 – is also subject to a CBM review before the PTAB, currently pending as Case No. CBM2014-00060.  The '022 patent is further subject to reexamination proceedings before the USPTO, pending as Control No. 95/002,372.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. Sections 1331, 1338.  The district court entered final judgment on November 13, 2014.  A60-61.  This appeal was timely filed on November 25, 2014.  A2005-06.  This Court has jurisdiction under 28 U.S.C. Section 1295(a)(1).

## PRELIMINARY STATEMENT

This case involves an attempt by TransPerfect to wrest value from a narrow business method patent that it purchased mid-way through the present litigation.  The patent on appeal – U.S. Patent No. 6,857,022 – was originally owned by Australian company WorldLingo.com Pty Ltd.  Having failed to develop a commercially viable product, WorldLingo sold the entire company to TransPerfect (including the '022 patent) for only $600,000.  As suggested by this modest purchase price, the patent's claim scope is wafer-thin.  Indeed, TransPerfect's own expert described the asserted claims as "narrow," even stating that he was "not sure" if the patent was novel in a "crowded field."

The '022 patent describes an online ordering system for translations in response to an Internet user's request.  According to the patent, a user first views a webpage on his or her browser (*e.g.*, Microsoft Internet Explorer) and decides if a translation is desired.  If so, the user orders a translation by

clicking an object on that webpage (*e.g.*, a hyperlink). The user's click causes a translation request to be sent to a back-end system – called the "translation manager." The translation manager, in turn, translates the webpage and returns the completed translation to the user for display. Importantly, the user need only input a single mouse click to order a translation; the clicked object is, therefore, called a "single action translation component." Likewise, any hyperlinks on the translated page are rewritten to point to the translation manager. As such, the user need not request additional translations as he or she peruses a website; they are automatically translated.

The narrow scope of the '022 patent claims is evident on their face. Indeed, all three independent claims recite significant restrictions:

- Claim 1 recites a series of steps performed by multiple parties, including displaying a webpage and single action translation component to a user, the user clicking the single action translation component to request a translation, and back-end components obtaining the translation for display to the user.

- Claim 17 recites an apparatus for performing the steps of claim 1 and is, therefore, similarly limited. For instance, claim 17 recites front-end components for receiving user requests – *e.g.*, a single action translation component – and back-end components for fulfilling those requests – *e.g.*, a translation manager.

- Claim 26 is severely narrowed by its means-plus-function format. In particular, its scope is limited to only those embodiments specifically detailed in the specification (if any).

TransPerfect seeks to exploit these narrow claims to obtain disproportionate leverage over a competitor. In particular, TransPerfect accuses MotionPoint's TransMotion® system, which provides human-translated webpages to Internet users, of infringing the '022 patent.

In straining to uphold the jury's verdict, the district court allowed TransPerfect to overextend its patent monopoly. For two of the three independent claims – claims 1 and 17 – TransPerfect presented no evidence that MotionPoint *directly* infringed each and every limitation. Instead, TransPerfect's evidence established, at most, that multiple parties – including MotionPoint's customers and third-party Internet users – collectively performed the claimed steps. Furthermore, the record lacks any evidence that MotionPoint exerted direction or control over those third parties to satisfy the relevant claim elements, never mind the level of control necessary for finding MotionPoint vicariously liable for such activity. Accordingly, this Court should reverse the unsupported verdict of direct infringement with respect to asserted claims 11, 17, 23 and 24.[1]

The district court also rendered a claim construction that broadened key limitations in ways inconsistent with the claim language and intrinsic

---

[1] Claim 11 is dependent upon independent claim 1. Likewise, claims 23 and 24 are dependent upon independent claim 17.

evidence.  Specifically, the district court construed the phrase "obtaining a translation" – as recited in independent claims 1 and 17 – in a way that allows the translation manager to be entirely passive.  Under the district court's construction, the translation manager need not be capable of translating webpages; it can simply act as a lookup table for ***pre-translated*** content.  As a result of this improper construction, MotionPoint technology that merely retrieves existing translations was found to fall within the patent's scope.  This erroneous claim construction provides an additional reason to reverse the district court's finding of infringement with respect to asserted claims 11, 17, 23 and 24.

For remaining independent claim 26, the district court acknowledged that structural disclosures were required in the specification to support certain means-plus-function clauses, but it identified none.  That is not surprising because the patent describes no such structures for ***three*** claimed functions.  The specification only repeats the recited functions, which this Court has repeatedly held will not satisfy the definiteness requirement of Section 112.  This Court should, therefore, reverse the district court's

erroneous claim construction and declare claims 26 and 27 invalid as a matter of law.[2]

Finally, the district court's permanent injunction should be vacated. In particular, the district court erred in failing to identify evidence in the record sufficient to justify a finding of causal nexus to lost sales. That is an especially daunting burden here, given that the patent-at-issue implicates only certain aspects of MotionPoint's product offerings. The evidence identified by the district court is far too generic to tie the patented features to any claimed lost sales.

The result of the foregoing legal errors is an overly broad judgment that is untethered to any cognizable claim of infringement. Accordingly, the judgment should be reversed or, at the very least, vacated.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in finding that MotionPoint directly infringes claims 11, 17, 23, and 24 of the '022 patent, where:

    a.  those claims require multiple independent actors to practice the recited elements; and

    b.  the jury heard no substantial evidence that MotionPoint exercised "control or direction" over those third-party actors.

---

[2]  Claim 27 depends upon independent claim 26 and, therefore, is also invalid.

5

2.    Whether the district court erred in its claim construction for the phrase "obtaining a translation" as recited in claims 11, 17, 23, and 24 of the '022 patent.

3.    Whether the district court erred in finding that claims 26 and 27 are definite and valid, where:

   a. the specification recites no structure corresponding to the "means for receiving an electronic communication";

   b. the specification recites no structure corresponding to the "means for returning a translation of said electronic communication"; and

   c. the specification recites no structure corresponding to the "means for returning a translation of said further electronic communication."

4.    Whether the district court erred in granting a permanent injunction against MotionPoint with respect to TransPerfect's '022 patent, where:

   a. TransPerfect failed to show that the alleged infringement by MotionPoint actually caused TransPerfect irreparable harm;

   b. TransPerfect failed to show that monetary damages cannot adequately compensate any harm; and

   c. The balance of the hardships weighs against an injunction.

## STATEMENT OF THE CASE

### A.    The Patent At Issue

The '022 patent is a business method patent directed to "a 'one-click' ordering system for obtaining an 'instant' translation of a web page, electronic mail or other electronic communication." A70(1:4-7). The '022 patent was filed on September 29, 2000. A63. The Background section describes the growing importance of the World Wide Web and e-commerce, such that the "only substantial barrier to global trade is language difference." A70(1:44-45). In particular, the specification discloses that prior "translation services [were] not user friendly since a large number of keystrokes [were] required by a user before the desired translation [could] be obtained." A70(1:60-62). The '022 patent purports to reduce this burden by providing a "single action translation component" that allows website visitors to order a translation with a single click. A70(2:15-19).

Figure 1 of the '022 patent (shown below) illustrates the general workflow of the claimed invention. A "customer 1 requests a web page 2 from a web server 3." A71(3:3-4). Upon receipt – depicted by the green arrow – the "web page 2 is displayed by the [customer's] browser and the customer 1 determines if a translation is required." A71(3:5-7). If a translation is required, "it is requested with a single action," *e.g.*, a click of

7

the mouse, thereby sending a request "to a translation manager 4." A71(3:7-16) (depicted by the red arrow). The "translation manager 4 processes the request by translating the text" and sends "[t]he translated web page 7 … to the customer's browser." A71(3:32-36) (depicted by the blue arrow).



FIG 1

A64 (highlighting added).

A number of different embodiments are described "for a one click component for performing the single action." A71(3:9-11). For instance, Figure 2 (shown below) illustrates a webpage in English about "Benefits for Educators" alongside "an explorer bar 11 that implements a one-click translation component." A71(3:47-50). The one-click component

(highlighted in red) indicates that the page is to be translated from the current language – English – to another language – German.  A71(3:50-53). To do so, the "user needs only direct a mouse pointer to the 'GO' button and click once … for the translation to be delivered by the translation manager." A71(3:53-56).



FIG 2

A71 (highlighting added).

Representative claim 1 recites the foregoing features as follows:

1.  A method of ordering a translation of an electronic communication, the electronic communication comprising at least text

9

of more than one word and one or more hyperlinks to further electronic communications, including the steps of:

displaying simultaneously to a user: at least part of said electronic communication; and a single action translation component, said single action translation component comprising an object identified as effecting a translation of said electronic communication in a single action;

said user clicking said single action translation component to request translation of at least said text of said electronic communication by transmitting said electronic communication, or an indicator of said electronic communication, to a translation manager; and

said translation manager:

obtaining a translation of said electronic communication;

directing transmission of said translation of said electronic communication to said user; and

providing translation of said further electronic communications when said hyperlink is activated:

by delivering a translation of said further electronic communications that was translated when said electronic communication was translated; or

by obtaining a translation of said further electronic communications when said hyperlink is activated.

A73-74(8:50-9:10).   Put simply, the '022 patent describes both (i) a front-end system for interfacing with users and submitting translation requests and (ii) a back-end system for receiving those requests and performing the translation.   The front-end system includes an original-language webpage, a browser for displaying said webpage, and a single action translation

component for initiating the translation process. The back-end system includes a translation manager for receiving a translation request, obtaining the translation, and directing the completed translation back to the user.

**B.    Procedural History and the District Court's Findings**

On June 11, 2010, TransPerfect commenced the instant action, seeking declaratory judgments of non-infringement and invalidity with respect to certain MotionPoint patents. A91. MotionPoint then filed its answer and compulsory counterclaims of infringement against TransPerfect on July 30, 2010. A92.

In the year that followed, TransPerfect sought to purchase its own patents to assert against MotionPoint. In particular, in August 2011, TransPerfect acquired a number of assets from a company called WorldLingo, including the '022 patent, for $600,000. A2009-10. TransPerfect amended its Complaint to assert its newly-acquired patents on July 1, 2011 and October 13, 2011, respectively. A97, A99.

On May 24, 2013, the district court resolved the parties' claim construction disputes and motions for summary judgment. A1-35. The district court determined that MotionPoint did not infringe two of TransPerfect's recently acquired patents, but permitted the remaining '022 and MotionPoint patent claims to be decided by a jury. A34-35.

The case proceeded to trial on six '022 patent claims and six MotionPoint patent claims. MotionPoint argued to the jury that the accused TransMotion® system did not infringe and that the '022 patent was invalid based on prior art. The jury rendered a verdict on July 12, 2013, determining that MotionPoint directly (but not indirectly) infringed the '022 patent and awarded $1,002,006 in compensatory damages. A2000-02. The jury also determined that the asserted MotionPoint patent claims were invalid and not infringed. A2003-04.

Following the verdict, TransPerfect moved for a permanent injunction under the '022 patent. A129. On November 15, 2013, the district court granted TransPerfect's motion for a permanent injunction. A1963. However, the district court stayed compliance with the injunction pending adjudication of the parties' post-judgment motions, and retained jurisdiction to modify or clarify the injunction as applicable. *Id*. Both parties moved under FED. R. CIV. P. 50(b) for judgment as a matter of law ("JMOL") and FED. R. CIV. P. 59 for a new trial. A2099-118; A2144-75; A2176.

On November 13, 2014, the district court resolved the parties' post-judgment motions (A36-59), entered an Amended Permanent Injunction (A62), and awarded a First Amended Judgment (A60-61). The district court denied MotionPoint's motions that the '022 patent is invalid and not

infringed, that TransPerfect's damages award should be reduced, and that the MotionPoint patents are valid and infringed. A54-58. It also denied TransPerfect's motions except insofar as it granted TransPerfect's JMOL to amend the permanent injunction and for post-verdict royalties and pre-judgment interest. A58-59. The district court awarded damages in the sum of $1,002,006, with interest, costs, as well as ongoing royalties in an amount to be determined. A60-61.

## SUMMARY OF ARGUMENT

1. The district court erred in not granting JMOL that MotionPoint does not directly infringe the '022 patent in view of the multiple actors required to infringe the asserted claims, including MotionPoint, its customers, and third-party Internet users. Under these circumstances, as a matter of law, there can be no direct infringement absent a vicarious relationship between MotionPoint and these separate parties. No such vicarious relationship exists here. Infringement cannot be premised on the actions of unidentified Internet users or MotionPoint's customers because there is no basis in the record to attribute those actions to MotionPoint.

Specifically, the language of asserted claim 11 unambiguously states that the "clicking" step is performed by an Internet user, not the translation provider. Likewise, the step of "displaying" an original-language webpage

is performed by the user's Internet browser – not MotionPoint – and the browser displays the webpage of the third-party customer. Because no single party performs every step of the claim, there can only be direct infringement under a theory of joint infringement. However, the lack of any evidence of an agency or contractual relationship renders that theory moot.

With respect to claims 17, 23 and 24, the district court erred in holding that MotionPoint provides the recited "single action translation component." Instead, the record shows that MotionPoint's customers – not MotionPoint – provide that component on their private websites. TransPerfect provided no evidence that MotionPoint itself ever "used" a system containing each and every claim element. The district court further erred in holding that MotionPoint "makes or sells" the '022 patent invention because MotionPoint only makes part of the claimed system.

2. The district court misconstrued the phrase "obtaining a translation" – as recited in asserted claims 11, 17, 23 and 24 – to mean "bringing about a new or retrieving an existing translation." This construction is not supported by the specification, which states that the invention must be capable of performing new translations on-the-fly. The district court's construction is based on its misreading of a disclosure relating to "caching" as an add-on feature. While new translations may be

14

cached after being translated by the translation manager, the invention must translate them in the first place.  The district court's construction allows a dependent feature – retrieving cached content already translated by the claimed system – to overwhelm the primary invention:  creating new translations.  Because the accused TransMotion® system only retrieves content previously translated by humans, it does not "obtain[] a translation" under the proper construction.  Thus, a judgment of non-infringement should be entered, or alternatively, a new trial granted.

3.    The district court erred in finding that claims 26 and 27 are valid and not indefinite.  These claims include three means-plus-function limitations, including the "means for receiving an electronic communication in response to clicking a single action translation component…."  The specification fails to disclose corresponding structure for this and the other means-plus-function limitations, rendering claims 26 and 27 indefinite and invalid.

4.    The district court abused its discretion by granting a permanent injunction against MotionPoint for infringement of the '022 patent – a patent purchased during the course of litigation and for which there is no causal nexus to any alleged harm.  The district court's findings that TransPerfect demonstrated irreparable harm and the inadequacy of monetary remedies

were an abuse of its discretion and factually incorrect. In particular, the district court made errors of law by relying on evidence that is legally insufficient to establish causal nexus under this Court's precedent in *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370 (Fed. Cir. 2012) ("Apple II") and *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352 (Fed. Cir. 2013) ("Apple III"). The district court further erred in finding that monetary damages do not provide adequate compensation based solely the parties' alleged status as competitors, and by ignoring the hardships imposed on MotionPoint by the permanent injunction.

## STANDARD OF REVIEW

Applying regional circuit law (here, that of the Ninth Circuit), this Court reviews the denial of a JMOL motion *de novo*, reversing "'when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013). The ultimate issues of claim construction and indefiniteness are also subject to *de novo* review. *Teva Pharm. U.S.A., Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 839 (2015). This Court reviews factual findings concerning extrinsic evidence to determine whether they are supported by substantial

evidence and, if they are not, this Court will reverse. *In re Cuozzo Speed Techs., LLC*, 2015 WL 448667, *8 (Fed. Cir. Feb. 4, 2015).

The grant of an injunction is "reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). This Court "may find an abuse of discretion on a showing 'that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008).

## ARGUMENT

## I. THE DISTRICT COURT ERRED BY NOT GRANTING JMOL OF NO DIRECT INFRINGEMENT, IGNORING THAT MULTIPLE PARTIES ARE REQUIRED TO PRACTICE ALL CLAIM ELEMENTS

The district court's decision to reject MotionPoint's motion for JMOL of no direct infringement was based on theories urged by TransPerfect for the first time in post-trial briefing and unsupported by the record. Specifically, the district court strained to preserve the verdict in view of the ***multiple independent actors*** required to infringe the asserted claims, including MotionPoint, its customers, and third-party Internet users. But direct infringement "requires a single party to perform every step of a claimed method." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). The only exception is where there exists a vicarious

17

relationship between MotionPoint and these separate entities. *See Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1363 (Fed. Cir. 2013) (no liability where "several parties have collectively committed the acts necessary to constitute direct infringement but no single party has committed all of the required acts" unless the accused infringer is "vicariously liable for another's actions"). To establish vicarious liability, however, TransPerfect must show a "principal-agent relationship or like contractual relationship" that ***requires*** the third parties to satisfy the missing claim element(s). *Id*. As described below, MotionPoint has no such control over these third-party entities.

### A.     The District Court Erred in Finding That MotionPoint Performed The "Clicking" Step of Claim 11

Claim 1, on which asserted claim 11 depends, is a method claim consisting of several steps. Notably, claim 1 requires that a "user" click on a "single action translation component." A73(8:62-64). At all times through trial, TransPerfect and its expert identified a single entity as performing this step: third-party Internet users visiting MotionPoint customer websites (*e.g.*, the Best Buy homepage). A522(504:13-21); A523-24(505:24-:506:7); A657-58(577:18-578:12). Accordingly, because MotionPoint neither performs this step nor controls the users who do, no verdict of infringement of claim 11 should have been rendered.

At JMOL, in order to overcome the lack of a single entity, the district court upheld the jury's verdict based on a completely different theory – MotionPoint "demonstrating" its TransMotion® product to prospective customers.  A56.  This theory, however, was not advanced at trial, so the record is bare with respect to such demonstrations.  Indeed, the only evidence cited by TransPerfect is a single statement from a former Best Buy employee that MotionPoint "showed him pages in Spanish."  A2184-85 (citing A1202(1253:1-21)).

Accordingly, the district court erred in two important respects.  First, the district court ignored the evidence *actually* introduced by TransPerfect that Internet users – not MotionPoint – perform the "clicking" step.  Second, the district court upheld infringement based on a post-trial theory completely unsupported by the record.

### 1.     MotionPoint Is Not Liable For The Acts Of Internet Users

In reversing the denial of a motion for judgment as a matter of law following a jury verdict of infringement, this Court in *Muniauction* set forth the fundamental precept that an accused infringer cannot be liable for infringement if it neither performs all steps of an asserted patent, nor exercises control over third parties that carry out the remaining steps.

*Muniauction*, 532 F.3d at 1330.  *Muniauction* is on all fours with the present case, and this Court should reach the same conclusion.

In particular, TransPerfect premised its infringement case on Internet users visiting the websites of MotionPoint customers (*e.g.*, Best Buy) and clicking hyperlinks thereon.  *See*, *e.g.*, A414-15(396:21-397:8) (describing a "user using a web browser surfing the web"); A522(504:13-21); A523-24(505:24-:506:7).   For instance, TransPerfect's infringement expert Dr. Clark described Internet users visiting the homepage for Best Buy at http://www.bestbuy.com and clicking a hyperlink identified as "Español." A425-26(407:18-408:11).   That hyperlink is highlighted in the screenshot below:



A2018 (highlighting added).   In cases involving third parties, direct infringement may only be found if a "principal-agent relationship or like

contractual relationship" exists between defendant and the third party. *Aristocrat*, 709 F.3d at 1363. That is far from the case here.

MotionPoint can no more control unidentified Internet users' independent decisions to visit webpages and click on links thereon than Google can control the terms users enter into its search engine. *See PA Advisors, LLC v. Google, Inc.*, 706 F.Supp.2d 739, 748-49 (E.D.Tex. 2010) (finding no joint infringement because the step of "providing, by the user to the local computer system, search request data" was not attributable to Google). At most, MotionPoint has an arms-length relationship with such users. *See Desenberg v. Google, Inc.*, 392 F.App'x. 868, 870-71 (Fed. Cir. 2010) (finding no direct infringement because defendant did not perform both "user" and "provider" steps of claimed method). This falls far short of the "principal-agent" or "contractual" relationship required by Federal Circuit precedent.

The Court's decision in *Muniauction* is instructive. There, the patent-at-issue related to bond auctions conducted over the Internet. *Muniauction*, 532 F.3d at 1321-22. One claimed step was performed by Internet bidders inputting data into a web browser, and the remaining steps were performed by the auctioneer's server. *Id*. at 1322-23, 1328–29. Specifically, defendant Thomson: (1) required bidders to install and configure software, including

entry of a pre-assigned bidder ID and password; (2) connected bidders to its server; (3) instructed bidders how to proceed throughout the auction using detailed screenshots and written explanations; and (4) exercised contractual control through software licenses. *Keithley v. Homestore.com, Inc.*, 636 F.Supp.2d 978, 984-85 (N.D.Cal. 2008) (summarizing the accused product in *Muniauction*). Despite noting that defendant "controls access to its systems and instructs bidders on its use," this Court found that was "not sufficient to incur liability for direct infringement." *Muniauction*, 532 F.3d at 1330.

MotionPoint's relationship with end users is even more attenuated. MotionPoint does not host the web pages on which the accused hyperlinks reside. A425-26(407:18-408:11) (confirming that MotionPoint customers such as Best Buy provide these webpages to users); A505-06(487:25-488:7); A523-24(505:19-506:3). Nor need Internet users click on the accused hyperlinks (*e.g.*, "Español") to access a translated webpage. Instead, users can simply input the URL for the translated site directly, and bypass the original-language page. A971(847:8-15).

Accordingly, MotionPoint cannot be liable for direct infringement under a theory of joint infringement. A party that does not perform all steps of a method claim can be liable for joint infringement only if it directs or

controls others in their performance of the claimed steps. *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1380-81 (Fed. Cir. 2010). Here, MotionPoint does not. The claims of the '022 patent could have been drafted to cover a single actor but they were not, and the district court erred by ignoring that explicit choice. A56.

2.    **The District Court Erred In Adopting A Post-Trial Infringement Theory For Which There Exists No Record Evidence**

The district court further circumvented the joint infringement analysis by upholding infringement on a post-trial theory unsupported by evidence. Specifically, the district court based infringement on MotionPoint allegedly "testing and demonstrating the single action translation component for customers." A56. The only evidence identified by TransPerfect in support of this theory, however, is a single line of designated deposition testimony from a former Best Buy representative, merely stating that MotionPoint employees showed him "pages in Spanish." A2184-85 (citing A1202(1253:1-21)). That lone statement represents the entire factual basis for the district court's finding that MotionPoint practices this limitation. The district court's analysis is simply inadequate.

### (a) TransPerfect's Experts Confirm The Lack Of Evidence Related To Customer Demonstrations

As an initial matter, TransPerfect and its infringement expert consistently – and only – accused third-party Internet users of performing the "clicking" step throughout trial. Dr. Clark confirmed his infringement theory as follows:

> Q.    This step of claim 1 requires a user clicking on the single action translation component, correct?
>
> A.    That's what it says.
>
> Q.    So this requires an Internet user clicking on the accused Español link, as an example, correct?
>
> A.    That's what we have shown, yes.

A522(504:16-21). Dr. Clark was quite clear he was not relying on MotionPoint as the infringing actor, even conceding that MotionPoint lacked control over the users that "click" the accused hyperlinks:

> Q.    You agree that MotionPoint doesn't have any control over the Internet users that surf the web and press that button, correct?
>
> A.    I wouldn't think so other than to provide the button.

A524(506:4-7). There simply exists no evidence linking MotionPoint's customer demonstrations to the asserted claims. This evidentiary shortcoming is fatal. Indeed, the lack of relevant expert testimony alone negates a finding of infringement. *See Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) (holding that "in a case involving

complex technology, when the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field.").

Likewise, the record lacks any basis to assess damages through MotionPoint's marketing demonstrations.  TransPerfect's damages expert, Mr. Hoffman, based his analysis on the "net accused revenue from the … accused sales of MotionPoint."  A657-58(577:18-578:12).  But the district court cited no evidence that MotionPoint's demonstrations to customers *caused* the accused sales – which comprise MotionPoint's entire revenue base.  TransPerfect introduced no testimonial or documentary evidence linking its post-trial infringement theory to the district court's damage award.  *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) (finding that, while some "uncertainty as to the extent of the damage" is allowable, the patentee must first prove that those damages are "attributable to the wrong and only uncertain with respect of their amount.").  Indeed, a lone statement from a MotionPoint customer cannot establish that more than a million dollars in damages are attributable to demonstrations.  Even if some damages were attributable to such demonstrations, the damages determined by the jury would need to be

remitted to cover only those sales linked to those demonstrations, for which Best Buy is the only customer of record.

### (b) The District Court's Finding Is Premised On A Misstatement Of The Record

In any event, the district court misstated the record in suggesting that MotionPoint clicked a "single action translation component for customers" at these demonstrations. A56. The identified testimony, from former Best Buy representative Jeffrey Weness, shows only that "pages in Spanish" were displayed to customers – and nothing more:

> Q. Did MotionPoint demonstrate anything at that meeting?
>
> A. Yes, they did. They – they had – they had created some Spanish language – some page pages in Spanish from – from Best Buy's website, and they showed us – they showed us them.

A1201-02(1252:25-1253:3). This testimony – the thin reed upon which the district court's entire JMOL decision of direct infringement rests – is insufficient as a matter of law to support the verdict. This testimony does not state that any MotionPoint employee presented an original-language webpage to Best Buy – much less a single action translation component displayed thereon. Nor does it suggest that MotionPoint (or anybody else) clicked said hyperlink to render the "pages in Spanish." Rather, the evidence merely shows that completed translations – however produced – were presented to customers. Indeed, the record shows methods for

accessing translated webpages that do not involve clicking a hyperlink, *e.g.*, typing the URL for the Spanish page directly into a browser or using a search engine such as Google.   A971(847:8-15).   The cited testimony, therefore, does not come close to establishing that MotionPoint clicked the hyperlinks recited in claim 11.

Indeed, even if TransPerfect's so-called "demonstrating" theory of infringement solved its divided infringement problem with respect to the "clicking" limitation, that theory creates other problems.  In particular, the record lacks any evidence showing ***how*** these "Spanish pages" were created, such as whether they were created by a "translation manager" as claimed. Moreover, no evidence suggests that the hyperlinks on these pages provided further translations when activated.  Accordingly, the district court erred in concluding that MotionPoint performed every step of claim 11 during customer demonstrations.  The record lacks any basis for this finding.  *See*, *e.g.*, *Aristocrat*, 709 F.3d at 1363 (rejecting patentee's attempt to bypass divided infringement based on IGT's "testing of its machines" because the record failed to show that IGT practiced the "awarding" step during those tests).

**B.     The District Court Erred in Finding That MotionPoint Performed The "Displaying" Step of Claim 11**

MotionPoint similarly does not perform the step of "displaying simultaneously to a user: at least part of said electronic communication; and a single action translation component." A73(8:56-61). This step is not performed by MotionPoint but, rather, by a web browser on the user's local machine. TransPerfect's expert, Dr. Clark, conceded this point at trial:

> Q.   But the step requires the user's web browser, correct?
>
> A.   Well, it requires some mechanism to display it to the user at the user's side.
>
> Q.   And that's the web browser, correct?
>
> A.   Presumably.

A522(504:5-9). TransPerfect presented no evidence that MotionPoint supplies users with a web browser, such as Internet Explorer, to display webpages pages upon receipt. It does not. Rather, installing, configuring, and using such browsers is completely at the user's discretion, and no evidence exists of a "principal-agent relationship or like contractual relationship." *Aristocrat*, 709 F.3d at 1363.

Moreover, MotionPoint does not provide the content displayed by the browser. Rather, the claimed "electronic communication" – that is, the original-language webpage requiring translation  – is supplied by the MotionPoint customer that hosts that website (*e.g.*, Best Buy). Both parties'

experts agree that the claimed "electronic communication" is the original-language webpage hosted by the customer, not the translated webpage provided by MotionPoint.  A431-32(413:23-414:3) (accusing the English-language Best Buy homepage); A1082(958:2-12); A1086(962:4-8). MotionPoint cannot be held responsible for the display of a webpage that is owned, stored and transmitted by a third party.  A521(503:11-19) (confirming that the customer provides the webpage-at-issue).

In rejecting MotionPoint's motion for JMOL, the district court ignored that the "patentee can usually structure a claim to capture infringement by a single party" and attempts to "unilaterally restructure the claim [and] the standards for joint infringement to remedy" its flaws.  *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007). It is, however, not within the district court's purview to rewrite claim 11 as drafted.  *Id*.

## C.    The District Court Erred in Finding That MotionPoint Provides the "Single Action Translation Component" of Claim 17

Claim 17 is a system claim consisting of several components.   In particular, claim 17 requires that the accused system comprise a "single action translation component."  A74(9:58-59).  TransPerfect and its expert relied upon hyperlinks on webpages created and provided by MotionPoint's

customers – not MotionPoint – to meet this limitation.  For instance, Dr. Clark walked through webpages hosted by Best Buy and Pizza Hut on their respective servers, each containing an "Español" hyperlink.   A425-26(407:18-408:11); A474(456:14-19); A521(503:14-21).

No act of infringement occurs, however, until the entire, allegedly infringing system is assembled.  Indeed, 35 U.S.C. § 271(a) defines a direct infringer as one who "without authority makes, uses, offers to sell, or sells any patented invention, within the United States…."  The "invention" is the entire invention, *e.g.,* the entire claimed system, and it is a fundamental principle of patent law that one who makes, uses, offers to sell, or sells less than the "assembled or functioning whole" is not a direct infringer. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972).

Here, MotionPoint never makes, uses, offers to sell, or sells the full invention.  The district court, however, affirmed the jury's finding of direct infringement and rejected MotionPoint's JMOL merely because MotionPoint "make[s], use[s] and sell[s] its TransMotion product" and "'obtains benefits' in the form of revenues from the system."  A56.  This misreads settled Federal Circuit precedent.

### 1.     Alleged "Use" By MotionPoint

The district court erred in finding that MotionPoint "used" the entire claimed system. For a system claim, direct infringement by "use" of the claimed system requires a party to use each and every element of the system. *Centillion Data Sys., LLC v. Qwest Comm'n Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). To "use" a system for purposes of infringement, a party must put the claimed invention into service, *e.g.*, "control the system as a whole and benefit from it." *Id*. The only exception is where the accused infringer is vicariously liable for the actions of another party that actually does "use" the entire system. *Id*. at 1287.

TransPerfect and its expert concede that the individual components supplied by MotionPoint are ***incapable*** of infringing the '022 patent standing alone. For instance, Dr. Clark accused third-party webpages – such as homepages for Best Buy and Pizza Hut – as supplying the claimed single action translation component. A425-26(407:18-408:11) (discussing "a button labeled Español" on the Best Buy homepage as the "single-click translation component"); A474(456:14-19). These webpages are hosted and supplied by customer web servers to which MotionPoint has no access. A521(503:14-21); A425-26(407:18-408:11); A523-24(505:19-506:3). To enable translation of a webpage, customers create their own button or

hyperlink that points to MotionPoint's TransMotion® system. A523-24(505:19-506:3).

Despite failing to dispute any of these facts, the district court summarily asserts that MotionPoint controls every element of the accused system. *See* A56 (stating that MotionPoint "'obtains benefits' in the form of revenues from the system" without comment). But MotionPoint does not "put into service" the "single action translation component" on any customer's websites as inferred by the district court. *Id*. Rather, customers implement their own front-end hyperlink solutions, and MotionPoint operates a back-end system for processing requests triggered by those components.

This is strikingly similar to the facts of *Centillion*. There, the patent-in-suit disclosed (i) a back-end system for processing data (maintained by accused infringer Qwest); and (ii) a front-end system for submitting requests (maintained by Qwest's customers). *Centillion*, 631 F.3d at 1281. This Court found that a ***Qwest customer*** may be liable for direct infringement because it "initiated demand for the service which causes the service provider's back-end system to generate the requisite report." *Id*. at 1285. But this Court also found that ***Qwest itself*** did not "use" the system because it never put into service "the personal computer data processing means,"

which required customer action. *Id*. at 1286. MotionPoint, like Qwest, is not accountable for its customers' acts. *Id*.

At best, the record shows that MotionPoint provides instructions that customers *may* follow to create their own hyperlink to MotionPoint's backend server – the accused "single action translation component." A525-26(507:3-508:8). For instance, at trial, TransPerfect identified "Linking Instructions" provided by MotionPoint to its customers as evidence of alleged "control." A436-37(418:17-419:15) (discussing A2032-33). But the mere supply of instructions is insufficient to establish control of the system for purposes of direct infringement. Even the producer of a system that provides a necessary component of the system to its customers and technical assistance for how to use that component is not liable for direct infringement. *See Centillion*, 631 F.3d at 1287 (finding that the supply of "software and technical assistance" did not establish control because it is "entirely the decision of the customer whether to install and operate this software"). Here, it is entirely the customer's decision whether and how to use these instructions and entirely outside of MotionPoint's control. In fact, many MotionPoint customers do not follow these instructions and, instead, use entirely different code. A951-52(827:17-828:12); A526(508:2-24). The

customer's voluntary actions cannot create the required vicarious relationship.

Even if providing linking instructions could establish "control" – which it does not – the linking instructions do not direct the customer to create an infringing component. The instructions only ask customers to "[i]nsert the code segment provided below *at a desired location* within the existing source code of your website" and state that the customer "may use *any* text, image or drop down list for the hyper-link to the translated content." A2032 (emphases added). Even if a customer followed these instructions verbatim, it is free to place the hyperlink anywhere it wants (*e.g.*, it need not be "simultaneously displayed" with the electronic communication, as required by claim 17) and with any identifier it wants (*e.g.*, it need not be "identified as effecting a translation in a single action," also required by claim 17). A526(508:14-19) (confirming that the customer can put "whatever text was meaningful to their audience on it").

Lastly, the district court makes passing reference to a contract that allegedly "binds [MotionPoint's] customers to place hyperlinks of the single action translation component on their websites." A56. But this service contract is similarly vague, and requires only that customers place "a hyperlink on the Site's home page … to allow an online user to view the

translated Site." A2209. Again, this hyperlink need not be displayed "simultaneously" with an electronic communication; it need not be "identified as effecting a translation"; and it need not obtain a translation in a "single action." In short, it need not be a "single action translation component" as claimed. MotionPoint has no control over whether its customers create a hyperlink with all of these elements, each of which is required to infringe.

Accordingly, the record lacks any evidence of "an agency relationship or other contractual obligation" that requires customers to supply the missing component as claimed. *Centillion*, 631 F.3d at 1287.

## 2.    Alleged "Making" and "Selling" By MotionPoint

Likewise, it is a fundamental principle of patent law that one who makes or sells less than the full "invention" is not a direct infringer. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 n. 2 (Fed. Cir. 2000) ("[O]ne may not be liable under § 271(a) for 'making' or 'selling' less than a complete invention."). In order to "make" the system under Section 271(a), MotionPoint would need to combine all of the claim elements. *Centillion*, 631 F.3d at 1288. This it does not do. Even under TransPerfect's infringement theory, MotionPoint manufactures only part of the claimed system. The customer, not MotionPoint, completes the system by providing

the "single action translation component" and installing it on webpages hosted on its private server.

Further, MotionPoint is not vicariously liable for the actions of its customers. As described above, MotionPoint's customers do not act as MotionPoint's agents as a matter of law, nor are they contractually obligated by MotionPoint to provide the specific "single action translation component" recited by the asserted claims. In particular, MotionPoint customers are free to place a TransMotion® hyperlink *anywhere* they want (*e.g.*, not "displayed" alongside the webpage to be translated), with *any text* they want (*e.g.*, not "identified as effecting a translation"), using *any number of steps* they want (*e.g.*, not obtaining a translation in a "single action"). The district court failed to appreciate that MotionPoint's customers – not MotionPoint – have sole discretion whether to include a hyperlink with these features, each of which is required to infringe claim 17.

## II.    THE DISTRICT COURT ERRONEOUSLY CONSTRUED THE TERM "OBTAINING A TRANSLATION"

Claims 11 and 17 of the '022 patent recite a translation manager for "obtaining a translation." The district court incorrectly construed this limitation to mean "bringing about a new or retrieving an existing translation." A15-17. Critically, the district court's construction is phrased in the *disjunctive*. Thus, a system may meet the limitation even if it is

capable of *only* retrieving pre-translated content (*e.g.*, content previously translated by someone else). That is, the translation manager need not be capable of translating webpages on its own; it can simply pull translations from storage. The intrinsic evidence explicitly undermines the district court's construction; the primary focus of the patent is translating on-the-fly rather than simply retrieving pre-translated content. This issue is dispositive, as MotionPoint pre-translates its customers' webpages using human translators *before* they are made available online. As described below, the accused TransMotion® system cannot perform *instant* translations in response to user requests.

## A.    The Specification Requires The Ability to Create New Translations

The '022 specification confirms that the translation manager's basic function is to translate electronic communications on-the-fly:

- "This invention … relates to a 'one-click' ordering system for obtaining an '*instant*' translation of a web page" (A70(1:3-7)) (emphasis added);

- "The translation manager 4 processes the request by *translating the text* (and possibly sound, video graphics, etc.) and optionally adding further information." (A71(3:32-34)) (emphasis added);

- "The translation manager 4 may store translation programs for effecting automatic translation of the identified web page." (A72(5:13-15)).

The specification *does* contemplate storing prior translations in cache that have previously been translated by the translation manager.  A71(3:25-27) (explaining that "static content can be translated once and cached").  But the translation manager must still translate the document in the first place.  Contrary to the intrinsic evidence, the district court's construction covers a "translation manager" that simply retrieves "existing translations" from a repository without ever having translated them previously.  Under this construction, the translation manager is little more than a look-up service.  In that case, the '022 patent would read on prior art that simply retrieves alternative-language web pages from storage.  A1859-60.

### B.    Disclosures Relating To "Caching" Do Not Support The Court's Construction

The caching feature is further described in the '022 specification as an *add-on* feature to the translation manager.  For instance, dependent claim 8 recites that, in addition to the translation manager described in claim 1, bandwidth demands may be reduced by "caching translated static content for future use."  A74(9:27-30).  Accordingly, the claims contemplate caching webpages *after* the translation manager has already translated them once.  The district court's construction, however, encompasses the retrieval of existing translations from external sources (*e.g.*, prior human translations)

alone.  This construction allows an ancillary caching feature to replace the translation manager's core function:  to provide new translations.

## C.     The '022 Prosecution History Belies the Court's Construction

During prosecution, the '022 applicant sought a claim that included the same "obtaining a translation" limitation.  A1761.  The claim, however, was rejected by the USPTO over cited prior art.  In particular, the Examiner rejected the pending claims over JP 11-292948 to Kato.  A1836-45.  In response, the Applicant distinguished Kato as merely retrieving pre-translated content:

> [T]he CD-ROM represents a database of stored translations and pronunciations of Internet homepages that are retrieved from the database according to the position of the mouse pointer and the text highlighted….    Arguably, ***no translation is being performed as a result of the highlighting process, but merely the retrieval of the relevant text*** (and pronunciation) that has already been translated and stored on the CD-ROM.

A1860 (emphasis added).  As such, the applicant distinguished embodiments wherein the translation manager simply accesses pre-translated content stored in a database.  According to the applicant, the translation manager must be capable of creating a new translation.  This statement conflicts with the district court's overly broad construction.

### D.    Under the Proper Construction, MotionPoint Does Not Infringe

The term "obtaining a translation" is properly construed as "bringing about a new translation, or retrieving an existing translation ***cached by the translation manager***." As described above, the translation manager must be more than a look-up service. It must be capable of fulfilling new translation requests and, only then, may return cached versions of those translations. Here, the accused translation manager – MotionPoint's Translation Server – is completely removed from the translation process. Rather, translations are performed by human translators long before any Internet user's involvement. A753(673:13-24).

Under the Court's construction, MotionPoint's Translation Server was found to infringe the "obtaining a translation" limitation simply by accessing these prior human translations from a database. This is contrary to the intrinsic evidence. Thus, the district court's construction should be overturned and judgment of non-infringement should be entered for MotionPoint, or, alternatively, a new trial granted.

## III.   THE DISTRICT COURT ERRED IN FAILING TO FIND CLAIMS 26 AND 27 INDEFINITE FOR LACK OF CORRESPONDING STRUCTURES

The parties contested whether independent claim 26 and dependent claim 27 were indefinite for reciting means-plus-function limitations without

disclosing a corresponding structure. Although the parties briefed the issue, the district court declined to render a decision in advance of trial. A148(165:9-10) ("I will construe the claims when I get to it"). Instead, the district court included constructions for these limitations in the instructions. A361(378:17-24). In its JMOL order, the district court ultimately found "sufficient structure to support these claims" but offered no further explanation. A55. The specification of the '022 patent does not support this finding.

Specifically, claim 26 is directed to a single-action translation ordering system in which a "translation manager" receives a source document, obtains a translation, and directs the translation back to the user. Moreover, all hyperlinks on the translated page are rewritten to return "further" translations. Claim 26 contains the following three means-plus-function limitations:

- "means for receiving an electronic communication in response to clicking a single action translation component displayed simultaneously with at least part of said electronic communication";

- "means for returning a translation of said electronic communication"; and

- "means for returning a translation of said further electronic communications when said hyperlink is activated."

A74(10:43-46, 55-58).    The parties do not dispute that each of the above limitations is governed by 35 U.S.C. Section 112, Paragraph 6.

## A.    Section 112 Legal Principles

A means-plus-function limitation under 35 U.S.C. Section 112, Paragraph 6 must be construed to include both function and structure.    The function is typically recited in the claim itself.    Section 112 requires that the specification provides the "corresponding structure, material, or acts" for the limitation.    35 U.S.C. § 112(f).    The structures that constitute the claimed means "'must be clearly linked or associated with the claimed function.'"  *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).

If a claim requires software to carry out a specified function, the structure cannot simply be a general-purpose computer for carrying out that function.    Rather, the patent specification must disclose an algorithm to perform the claimed function, along with the processor/computer for executing that software.    *See, e.g., Ergo Licensing*, 673 F.3d at 1365; *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518 (Fed. Cir. 2012) ("[I]n a means-plus-function claim in which the disclosed structure is a computer … programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer

42

programmed to perform the disclosed algorithm.") (internal quotation marks omitted). A patentee may express this algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted). Whether "a person of skill in the art could devise some means to carry out the recited function" is irrelevant to Section 112 analysis; rather, the question "is whether the specification contains a sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph 6." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009); *see Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008) ("'[C]onsideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification.'").

Here, the specification fails to disclose any structure for the three functional claim limitations. Failure to disclose corresponding structure for a means-plus-function limitation renders that limitation indefinite under 35 U.S.C. Section 112 and the corresponding claim invalid. *See Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006); *NetMoneyIN Inc.*

*v. VeriSign Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008).  Thus, it follows that

claims 26 and 27 are invalid as a matter of law.[3]

### B.    The Specification Discloses No Structure for "Receiving an Electronic Communication"

The '022 patent specification fails to disclose sufficient structure for

the limitation "receiving an electronic communication in response to

clicking a single action translation component…."  A74(10:43-46).  The

Court determined that the translation manager itself is the "structure" for

receiving the electronic communication.  A1978 (construing structure to be

"[p]ortion of the translation manager connected to a communications

network.").  But none of the references to a translation manager "receiving

an electronic communication" in the '022 patent's specification make any

reference to structure, particularly the necessary structure for the claimed

function of "receiving."   The only disclosures remotely relating to the

receipt of an electronic communication by the translation manager are purely

functional, *e.g.,* stating that:

- "Once the translation is requested by a single action, ***the web page*** … ***is transferred*** 5 to a translation manager 4."

- "The translation manager 4 ***will retrieve*** the original web page 6 from the web server 3."

---

[3]   The district court did not cite any extrinsic evidence in support of its
finding on indefiniteness.  A54-55.  Thus, this Court should review all
aspects of that finding *de novo*.  *Teva*, 135 S.Ct. at 841.

A71(3:13-16, 28-31) (emphases added).  Likewise, Fig. 1 of the '022 patent provides a schematic showing only an arrow between a "Customer with Web Browser" and the "Translation Manager":



FIG 1

A64 (highlighting added).  Each of these disclosures does nothing more than describe functions of the system.  A functional description of a functional term, however, is insufficient to bring the '022 patent claims outside the purview of Section 112, Paragraph 6.  *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099-1100 (Fed. Cir. 2014) (rejecting patentee's proposed structure as "nothing more than a functional description").

The foregoing passages simply state that a webpage is transferred to a translation manager. These disclosures do not give any information about the system's structure, or how that transmission occurs. They simply state that the translation manager is capable of such receipt – without guidance as to the structure of the device, even as to whether it is part of the translation manager, or an additional accessory or peripheral device. Indeed, the specification does not even specify whether this function is performed by either hardware or software, or a combination of the two. Thus, no corresponding structure for "receiving an electronic communication" is disclosed in the specification, much less "clearly linked or associated with the claimed function." *Ergo Licensing*, 673 F.3d at 1363 (internal quotation marks omitted).

## C.    Even if the "Receiving" Function Was Performed By Software, The Specification Fails to Disclose Any Algorithm

While the specification is silent, other evidence suggests that the translation manager is **software**. For instance, Dr. Clark testified that "source code from the Translation Server" – the accused translation manager – is responsible for performing the present function. A476(458:19-22); *see also* A472(454:7-16) (relying on "Translation Server software"); A480-81(462:22-463:1) ("Well, again, this is source code from the Translation Server."). Further, Phillip Scanlan, the sole inventor of the '022 patent,

confirmed that his invention was described by a specification that detailed "software requirements." A316-17(333:11-334:5).

In that scenario, there must be some disclosure of the algorithm performed by this software to satisfy the recited function. Here, there is none. At best, there is the disclosure of a computer in Figure 1, presumably representing the processor responsible for executing the Translation Manager software. But that disclosure alone does not satisfy the structure requirement; the corresponding algorithm must also be disclosed. *See Ergo Licensing*, 673 F.3d at 1365. Indeed, at trial, Dr. Clark testified that the structure for "receiving an electronic communication" is simply "whatever code in the translation manager is connected to the network and capable of receiving that request." A476(458:4-12). Again, TransPerfect cannot rely on "whatever code" exists that performs a particular function; there must be code that performs a specific algorithm disclosed in the specification. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009) (finding no infringement where patentee identified the same function in the accused product, but not source code for the same algorithm in the specification). Here, the specification has none.

**D.    The Specification Discloses No Structure for "Returning A Translation of Said Electronic Communication"**

The '022 specification similarly fails to disclose sufficient structure for the second means-plus-function limitation in claim 26: "means for returning a translation of said electronic communication."  A74(10:55-56). The entirety of the disclosure in the '022 patent specification relevant to this limitation is as follows:

- "The translated web page 7 is transferred to the customer's browser and displayed in the requested language."

- "[T]he translated communication may be returned to the translation manager for transmission to the user or alternatively the translation manager may append routing information to the communication that directs the transmission of the translated communication to the user."

A71(3:34-36);  A72(5:17-22).    This again merely restates the function. Figure 1 likewise illustrates just an arrow between the "Translation Manager" and the "Customer with Web Browser."  A64 (reproduced above). These disclosures fail to show any ***means*** for performing the recited function of returning a completed translation to the user.

The Court adopted "translation programs or engines" or "translation sites with programs or engines" as structure corresponding to this "returning" function (A1979), presumably based on the alleged support offered by TransPerfect in its briefing.  *See* A2132 (citing A72(5:13-31)).

These excerpts, however, refer only to *function*, disclosing that "the translated communication may be returned to the translation manager for transmission to the user." A72(5:13-22).

Indeed, the structures identified by the district court – "translation programs" and "translation engines" – are described purely functionally. In particular, "translation programs" are described only once as follows: "The translation manager 4 may store translation programs *for effecting automatic translation* of the identified web page." A72(5:13-15) (emphasis added). Likewise, the specification addresses "translation engines" in only two locations, as performing the function of translating:

- "In some cases, a suitable translation engine will not be available and it will be necessary for the document *to be translated* by a human."

- "[T]he translation manager 4 may include translation engines 20 *for performing the required translation*."

A72(5:23-25); A73(8:34-36) (emphases added). Once again, corresponding structure is not disclosed in the specification, much less "clearly linked or associated with the claimed function." *Ergo Licensing*, 673 F.3d at 1363.

In any event, the Court's structures for the two "returning a translation" means are directed toward the incorrect function. These limitations describe sending a document that has *already been translated*

back to the user.  For instance, claim 26 recites a "means for returning a translation" limitation **after** the "one or more translation engines translating said electronic communication" limitation.  A74(10:52-56).  The translation engines and/or programs are directed to the earlier step of translating the web page (*e.g.* for "effecting automatic translation of the identified web page").  A72(5:13-15).  No link exists between "returning a translation" and the portion of the specification describing translation engines and/or programs, as explicitly required by this Court's precedent.  *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1312 (Fed. Cir. 2001) (requiring a "clear link or association between the disclosed structures and the function recited in the means-plus-function claim limitation").  Accordingly, such programs and/or engines again fail to provide sufficient structure as a matter of law.

### E.    The Specification Discloses No Structure for  "Returning A Translation of Said Further Electronic Communication"

The '022 patent further fails to disclose any structure for the third means-plus-function limitation of claim 26:    "means for returning a translation of said further electronic communications when said hyperlink is activated."  A74(10:57-58).  The **only** disclosure addressing the return of "further" electronic communications is as follows:

> The translation manager may also replace all links in the
> translated web page 7 with links that point to the translation
> manager 4. This enables the customer to surf an entire web site,
> or indeed many websites because often the links on a page are
> to other websites, without the need to separately request
> translation of each page. Once translation of one page is
> requested, linked pages may be automatically translated (either
> when the link is clicked or in advance) in anticipation of the
> customer's needs.

A71(3:36-45). The district court seemingly relied on this disclosure in reaching its construction of structure: "translation programs or engines" or "translation sites with programs or engines." A1979. But this disclosure explains ***how translations are obtained*** in response to the user clicking a hyperlink (*e.g.*, by performing automatic translation). It does not, however, provide any structure for actually ***returning that translation*** to the user as required.[4]

Dr. Clark's analysis is informative. In analyzing the "returning a translation" limitation, Dr. Clark described the corresponding structure as follows:

> Well, again, this is source code from the Translation Server.
> It's telling us that it has a function called "translation," and – or
> a "do get" for the translation package.

---

[4] The district court adopted the same structure for "returning a translation of said further electronic communication" as "returning a translation of said electronic communication." For the reasons set forth above, TransPerfect cannot point to any algorithm described in the specification. *See supra* Section III.D.

A480-81(462:19-463:3).   Tellingly, Dr. Clark makes no mention of any algorithm disclosed in the specification, nor makes any effort to establish that MotionPoint's Translation Server software practices that algorithm or an equivalent thereof.  He cannot because no such algorithm is disclosed.

### F.    TransPerfect's Post-Trial "HTTP" Construction Was Not Before The Jury and Would Necessitate Vacating Infringement

As discussed above, the lower court failed to cite any structure corresponding to the three means-plus-function limitations of claims 26 and 27.   A55.   Recognizing this shortcoming, TransPerfect attempted to supplement the record post-trial by identifying supposed "algorithmic descriptions" in the specification.   A2132-33.   In particular, TransPerfect relied upon a passing reference to an "HTTP" protocol in the Background section: "When the URL is known the corresponding resource can be requested, located, and displayed on the client computer using a protocol such as HyperText Transfer Protocol (HTTP)."  A70(1:23-26).

As an initial matter, the HTTP protocol was never presented to the jury as structure for the present limitation.   For instance, the jury was instructed that the structure for the function of "receiving an electronic communication in response to clicking a single action translation component" is the "portion of the translation manager connected to a

communication network." A1978. At no time was the jury asked to consider the HTTP protocol, or whether the accused instrumentalities practiced an equivalent algorithm. Accordingly, accepting TransPerfect's argument necessarily means that the district court committed legal error in construing claim 26 for the jury without identifying this HTTP protocol.

Regardless, the "HTTP" disclosure is not remotely linked to the recited functions. Indeed, TransPerfect's argument is premised upon a single, passing reference to "HTTP" protocol in the "Background to the Invention" section of the specification as allegedly supplying sufficient structure for three distinct functions. Any discussion of HTTP beyond this single sentence has no foundation in the specification and is mere attorney argument. This sentence does not come anywhere near disclosing three structures that are "clearly linked or associated with the claimed function[s]." *Ergo Licensing*, 673 F.3d at 1363 (internal quotation marks omitted).

Indeed, there is nothing in the specification that links that protocol to the recited functions. For instance, no passage states that the translation manager "receives an electronic communication" via HTTP, or that a translation program or engine "returns a translation" via HTTP.

TransPerfect, recognizing this deficiency, instead relied on what its expert said would be known to a person skilled in the art rather than what is actually in the specification. For instance, in post-trial briefing, TransPerfect relied on testimony from its expert describing "servlets" in MotionPoint's "web server" that are allegedly "invoked" when hyperlinks are clicked. A2128-29. But this Court has repeatedly stated that the express disclosure of the specification itself is what matters, not the disclosure *and* the knowledge of a person of skill in the art:

> [W]e rejected the argument that no more specificity was needed to support the claimed function because "a person skilled in the art could readily fashion a computer-based means for performing the 'assigned function' ….." We explained that the *disclosure* must identify the method for performing the function, whether or not a skilled artisan might otherwise be able to glean such a method from other sources or from his own understanding.

*Noah Sys. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012).

This Court's holding in the *Blackboard* case is instructive. There, the Court considered a patent claiming a "means for allowing access to and control of the data file … based on the access level of the user," and the corresponding structure was allegedly "a server computer with an access control manager…." *Blackboard*, 574 F.3d at 1382. Blackboard argued that the following sentence sufficiently disclosed the access control manager's structure because a person of ordinary skill in the art would recognize its

application to the recited functions: "'Education support system 100 provides multiple level of access restrictions to enable different types of users to effectively interact with the system … while preserving confidentiality of information.'" *Id*. at 1384.   This Court rejected Blackboard's argument that one skilled in the art would understand that disclosure to connote structure:

> [T]hat language 'simply describes the function to be performed.'  It says nothing about how the access control manager ensures that those functions are performed…. ***Consideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification***.

*Id*. at 1384-85 (internal citation omitted) (emphasis added).  To be sure, the "'testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification.'"  *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 498 F.Appx. 986, 992 (Fed. Cir. 2013).

The same is true here:  TransPerfect cannot supplant the specification with expert testimony or attorney argument.  It is impossible to determine whether the means by which TransMotion® performs the recited functions is identical (or equivalent) to anything disclosed in the patent – the patent discloses nothing.

Likewise, TransPerfect's suggestions that the claimed functions comprise "basic" Internet functionality are unavailing.  A2127.  This Court

has unequivocally held that structure cannot be premised upon techniques known in the field. Rather, it must be disclosed in the specification. That was exactly the question faced by this Court in *Biomedino*. There, the specification included a general statement referencing popular techniques for "automatically operating valves." *Biomedino v. Waters Tech.*, 490 F.3d 946, 950 (Fed. Cir. 2007). But the Court found that disclosure insufficient to establish structure, holding that "a bare statement that known techniques or methods can be used does not disclose structure." *Id.*    at 953. The same is true here. TransPerfect cannot circumvent the requirements of Section 112, Paragraph 6 simply by claiming that a feature is "basic to the Internet." A2127.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING AN INJUNCTION

Although MotionPoint believes that a judgment in its favor ought to be entered, to the extent that any liability issues remain, the district court's issuance of an injunction must be vacated.

In *eBay*, the Supreme Court overturned this Court's former presumption that a permanent injunction should issue after a finding of infringement, placing the burden of proof squarely on the plaintiff. *See eBay*, 547 U.S. at 391. Specifically, for a permanent injunction to issue, the movant must demonstrate: "(1) that it has suffered an irreparable injury; (2)

that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id*.

At minimum, the district court abused its discretion by finding that TransPerfect demonstrated irreparable harm, the inadequacy of monetary remedies, and that the balance of hardships tips in TransPerfect's favor.

## A. TransPerfect Cannot Avoid This Court's Precedent Requiring A Causal Nexus Between The Infringing Conduct And Any Irreparable Harm

TransPerfect must not only prove that it suffered irreparable injury, but "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple III*, 735 F.3d at 1359-60 (quotation marks omitted). This causal nexus requirement is "a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition – *e.g.*, 'sales [that] would be lost even if the offending feature were absent from the accused product.'" *Id.* at 1361. If "the accused product would sell almost as well without incorporating the patented feature," then "the harm that flows from the alleged infringement (the only harm that should count)" cannot support an

injunction. *Id*. at 1360-61. Otherwise, a patentee could "leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Id*. Here, TransPerfect failed to carry its burden to prove causation, and transparently sought to "leverage its patent for competitive gain beyond that which the … value of the patent" – $600,000 – could possibly warrant. *Id*.

The district court's finding that TransPerfect met its burden of proving a causal nexus rests on multiple errors of law and demonstrably erroneous factual findings. In particular, the district court made errors of law by relying on alleged evidence that is legally insufficient under this Court's precedent in both *Apple II* and *Apple III* to establish nexus. The district court also made errors of fact by ascribing testimony to a witness that simply was never said – the sole evidence cited by the court in support of a nexus. Each of these errors is independently sufficient to warrant reversal.

        **1.**    **The District Court Erred By Relying on Evidence Insufficient as a Matter of Law Under *Apple II* and *Apple III***

In *Apple II* and *Apple III*, this Court unequivocally held that, to show irreparable harm sufficient to warrant entry of an injunction, a patentee must demonstrate a causal nexus between the alleged harm and the infringement.

The district court erred by finding a nexus based upon evidence that is insufficient under that precedent.

In *Apple II*, this Court instructed that demonstrating a causal nexus requires the patentee to "show that the infringing feature drives consumer demand for the accused product." *Apple II*, 695 F.3d at 1375. In that case, patentee Apple argued for a watered-down version of the nexus requirement, such that it could "make[] a case for nexus circumstantially, based on the popularity" of certain features. *Id*. This Court disagreed, holding that the causal nexus standard requires a link between the demand for the product and patented feature: "To establish a sufficiently strong causal nexus, Apple must show that consumers buy the Galaxy Nexus because it is equipped with the apparatus claimed in the '604 patent – not because it can search in general, and not even because it has unified search." *Id*. at 1376.

The Court set forth exemplary ways in which a patentee could make the required showing. These include "evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions," "evidence that inclusion of the patented feature makes a product significantly more desirable," or "evidence that the absence of a patented feature would make a product significantly less desirable." *Apple III*, 735 F.3d at 1364. Consistent with these exemplars, this Court warned that "[t]he

causal nexus requirement is not satisfied simply because removing an allegedly infringing component would leave a particular feature, application, or device less valued or *inoperable*." *Apple II*, 695 F.3d at 1376 (emphasis added).

Contrary to this instruction, the district court in this case ruled that causal nexus was satisfied solely because removing the allegedly infringing feature would render the accused device inoperable. Specifically, the district court relied upon the testimony of a single MotionPoint employee, Mr. Eugenio Alvarez, to find that the causal nexus requirement was met. Excerpted below is the whole of the district court's analysis:

> TransPerfect highlights evidence presented at trial to establish a connection between the infringing components of MotionPoint's TransMotion system and consumer demand for that product. In particular, it points to the testimony of MotionPoint's Director of Software Development, Eugenio Alvarez, who testified that *the "implicit navigation" and "single-action translation" features of the TransMotion system – the allegedly infringing components – were integral parts of the system*. Trial Tr. 387:13-22; 514:22-23 (noting that the TransMotion system would be "*impossible to use if you didn't have implicit navigation*").

A49-50 (emphases added). The district court therefore concluded that, because the allegedly infringing features were "integral" to the accused product and the accused product would be inoperable without these features, nexus was satisfied. That analysis plainly conflicts with this Court's precedent.

Indeed, the district court's analysis cannot be squared with *Apple II*, which unequivocally found evidence that a feature is "core" to the infringing product (or even necessary to its operation) to be insufficient – by itself – to establish a causal nexus. *Apple II*, 695 at 1376. The *Apple II* Court used the analogy of a laptop computer to illustrate this point:

> A laptop computer, for example, will not work (or work long enough) without a battery, cooling fan, or even the screws that may hold its frame together, and its value would be accordingly depreciated should those components be removed. ***That does not mean, however, that every such component is "core" to the operation of the machine, let alone that each component is the driver of consumer demand.***

*Id.* at 1376 (emphasis added). Thus, the importance of a component to a product's technical operation is not indicative of its importance to consumer behavior. Rather, a patentee must show that "***consumers buy*** the [accused product] because it is equipped with the apparatus claimed in [the patent]." *Id.* (emphasis added).

Here, the district court short-circuited the correct inquiry in holding that, because a feature is "integral" or necessary, it therefore, *ipso facto*, drives customer demand. By the district court's logic, any number of the necessary components in an accused product (*e.g.*, wires, monitors, keyboards, and the Internet) drive demand for the product. That analysis is legally erroneous.

In any event, the employee testimony relied upon by the district court is also insufficient as a matter of law under this Court's instructions in *Apple III*. There, this Court instructed that evidence that an alleged infringer's employee believed a patented feature to be "important" to the accused product was insufficient to establish causal nexus. *Apple III*, 735 F.3d at 1367. In particular, the Court found that "evidence that [defendant's] employees believed it to be important to incorporate the patented feature into [defendant's] products" is "not dispositive" and "insufficient by itself to establish the requisite causal nexus." *Id*. (internal quotation marks omitted).

The same is true here. Mr. Alvarez is a senior software developer at MotionPoint focusing on the technical operation of MotionPoint's TransMotion® system. A805(725:20:23). Whether he believes that a particular feature is necessary for that system to function is a separate inquiry from whether those same features drive consumers to purchase TransMotion® services. The record is silent as to the latter.

### 2. The District Court Made Clearly Erroneous Factual Findings

Even if employee testimony could independently establish a causal nexus, the district court misstated the very testimony upon which its nexus finding is based. Specifically, the district court incorrectly attributed Mr. Alvarez to testifying that "the 'implicit navigation' *and* '*single-action*

*translation*' features of the TransMotion system – the allegedly infringing components – were integral parts of the system." A49. But Mr. Alvarez did not discuss the "single action translation" feature in any manner. The entirety of the cited testimony is reproduced below:

> Q. Is it – is the point of Implicit Navigation that if you switched over to the Spanish version and then you clicked on a link and it went back to English, that that would make the site hard to use?

> A. I would say it would make the – I wouldn't say hard to use, I would say impossible to use if you didn't have Implicit Navigation.

A576-77(154:16-20, 154:23-155:1). But the TransMotion® system found to infringe purportedly includes **both** the "implicit navigation" and "**single-action translation**" elements of the '022 patent. The district court cites no evidence that the single-action translation feature drove customer demand, either alone or in combination with the implicit navigation feature. As such, the district court's finding that the patented features drove demand lacks any factual support.

TransPerfect will likely argue that a causal nexus exists because all the features of TransMotion® are patented features of the '022 patent. The record flatly contradicts this argument. TransMotion® is a complex cloud-based website translation solution. It includes technologies that quickly capture content to be translated from customer websites, provide pricing

estimates for translations, stage webpages for translation using human translators, and rapidly deploy a translated version of the customer's website to foreign language speakers via a server. A748-49(668:4-669:2); A752(672:10-21); A753(673:13-24); A924(800:6-20); A964(840:5-13). The accused features – *e.g.*, the "single action translation component" and "implicit navigation" – are but individual components of this complex system. There is no evidence that any of the claimed features drive consumer demand.

> ### 3. Under the Correct Legal Standard, TransPerfect Failed to Show a Causal Nexus and the Injunction Should Be Vacated

At trial, TransPerfect failed to introduce any documentary or testimonial evidence demonstrating that the '022 patent technology drove customer demand, much less the type of evidence that the *Apple III* Court held **could** support such a showing. In *Apple III*, the plaintiff relied, in part, on a conjoint survey performed by its expert to prove causal nexus. *Apple III*, 735 F.3d at 1366-67. The conjoint survey allegedly showed the "price premium" that customers were willing to pay for an accused product incorporating the patented features over a product not incorporating these features. *Id*. While the district court held that this study was irrelevant, the

*Apple III* Court disagreed and directed the district court to consider whether the conjoint study proved the required nexus on remand. *Id*. at 1368.

Here, TransPerfect has not introduced ***any*** evidence remotely rising to the specificity of the conjoint study in *Apple III*. For instance, TransPerfect's experts introduced no consumer preference studies or questionnaires, or otherwise attempted to quantitatively determine what attributes of the relevant technology drove consumer demand. Nor did TransPerfect present testimony or documents from a single TransMotion® customer regarding the factors that drove demand. As a result, TransPerfect failed to provide reasonable, non-infringing alternatives that are needed to focus the inquiry on "the claimed invention in the context of the accused product, and not just the importance, in general, of features of the same type as the claimed invention." *Id*. at 1364.

TransPerfect's evidentiary shortcoming is telling. Indeed, the record explicitly shows that other factors drive demand. For instance, TransPerfect's own damages expert testified that it was the desire to make sales to foreign language speakers that drives demand for TransMotion®, and not any particular aspect of the technology:

> One distinguishing feature of these two companies and it's important to distinguish it, is the technology that brings us in here. That's certainly not what drives the decisions. ***That's not what is driving the demand.***

> What drives the demand is that Delta Airlines operates in 70 countries. They need to sell tickets in Japan. They need a Japanese website. That's why they come in here. That's what is driving the demand. It is not that somebody at Delta woke up one morning and said we have to have a proxy-based web server that will do the translations. It's the realization that they need to sell tickets in Japan.

A1594-95(1602:25-1603:10).

Likewise, the district court completely ignored the only evidence from *actual MotionPoint customers*. Representatives from Delta and Best Buy identified factors outside the scope of the '022 asserted claims as the basis for their decisions to use TransMotion®. Both customers identified fast synchronization, high quality human translation, and the ability to provide a translated website in 90 days for a low price as key factors in their decisions. *See*, *e.g.*, A1196-97(1247:23-1248:5); A1198(1249:6-17); A1199-200(1250:14-1251:15); A1204-05(1255:7-1256:5); A2035-36; A1452-53(1460:8-1461:19). Thus, the district court's conclusion that a causal nexus exists is a "clear error of judgment." *Innogentics*, 512 F.3d at 1379.

### B. The District Court Erred By Finding that TransPerfect Will Suffer Irreparable Harm Merely Because the Parties Are Competitors

Regardless of whether there exists a causal nexus to the allegedly infringing conduct, the district court erred in finding any irreparable harm in the first place. Mere loss of sales cannot justify an injunction; instead, the

movant must show irreparable harm in the form of lost market share or otherwise. *eBay*, 547 U.S. at 391-393. And lost market share cannot be inferred from the mere fact that the parties directly compete. *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683-84 (Fed. Cir. 1990). Any such presumption would be inconsistent with the Supreme Court's rejection of "categorical" rules in deciding entitlement to injunctive relief. *eBay*, 547 U.S. at 393-94.

Nevertheless, the district court relied solely on evidence that MotionPoint and TransPerfect are direct competitors in finding irreparable harm. The Court's entire analysis of irreparable harm is reproduced below:

> Here, TransPerfect and MotionPoint are in direct competition with each other. Neither TransPerfect nor its predecessor in interest had chosen to license the patent. The royalty rate that a willing licensor would charge would not be adequate in this situation, and the correct rate would be difficult to calculate and enforce. TransPerfect has shown irreparable harm from the uncompensated infringement….

A50. TransPerfect offered no evidence regarding how much market share it has lost or will lose specifically as a result of the infringing features. Nor did TransPerfect introduce revenue or market-share projections that point to any losses in the future. The district court cannot infer irreparable harm simply because the parties compete in the same field.

### C.    The District Court Erred In Finding That Monetary Damages Do Not Provide Adequate Compensation

The second *eEbay* factor "requires a patentee to demonstrate that 'remedies available at law, such as monetary damages, are inadequate to compensate' the patentee for the irreparable harm it has suffered." *Apple III*, 735 F.3d at 1368. Even if TransPerfect had shown lost market share due to infringement (it did not), the district court erred in finding that monetary damages would not provide adequate compensation for any such harm. The district court simply presumed that a license would be inadequate based on conjecture that "the correct [royalty] rate would be difficult to calculate and enforce." A50. The district court failed to cite any support for this proposition. Nor could it. The record lacks any evidentiary support that money damages cannot adequately compensate for any lost sales.

Rather, the record suggests the opposite. Indeed, TransPerfect's own damages expert purported to quantify the royalty rate that should apply post-verdict. A2081 (proposing a "reasonable royalty rate for MotionPoint's ongoing, post-judgment infringement"). Accordingly, the district court court's finding that future monetary compensation would be difficult to calculate lacks any factual support.

### D.    The Balance of Hardships Does Not Support an Injunction

The district court further abused its discretion in concluding that the balance of hardships favors TransPerfect.  A50.  The balance-of-hardships factor "assesses the relative effect of granting or denying an injunction on the parties."  *Apple III*, 735 F.3d at 1371.  In *Apple III*, this Court affirmed the district court's determination that the balance-of-hardships factor was neutral at best.  *Id*. at 1371.  TransPerfect's showing here is even weaker.

### 1.    TransPerfect Will Not Suffer Any Significant Hardship In The Absence Of An Injunction

The district court's decision with respect to hardship rests on the fact that "TransPerfect and MotionPoint are in direct competition with each other."  A50.  That is, TransPerfect faces the hardship of being forced to compete against products containing its own inventions.  The district court, however, fails to note that there is no evidence that the ***specific patented features*** confer MotionPoint with any competitive advantage over TransPerfect.  Because there is no nexus between the infringing features and any harm, the district court necessarily erred in ruling that the balance of hardships favored TransPerfect.  *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (finding hardship due to competition when there are "resultant harms" of lost market share).  It cannot be a

"hardship" to compete against a product with an infringing feature if that feature has no impact on sales or buying decisions.

Further, the PTAB's preliminary rejection of the '022 claims as invalid seriously undermines any argument that TransPerfect would be irreparably harmed. On July 23, 2014, the PTAB instituted a CBM review of claims 1-28 of the '022 patent under 35 U.S.C. Section 112, Paragraph 1, on the ground of lack of written description, and of claims 23 and 25-28 under 35 U.S.C. Section 112, Paragraph 2, on the ground of indefiniteness. A2054-56, 2061-69. Thus, TransPerfect "has not suffered any cognizable harm at all if its patents were improvidently granted." *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F.Supp.2d 69, 78 (D. Mass 2013).

## 2. MotionPoint Is Suffering Substantial Hardship From The Injunction

By contrast, the record shows that there is real hardship to MotionPoint should the district court's injunction continue to stand. The district court's injunction forced MotionPoint to implement design-arounds for hundreds of customer websites, harming MotionPoint, its customers, and the millions of consumers who access those sites. A2090-91; A2097. MotionPoint customers are likewise forced to endure the anxiety and uncertainty that accompanies having to change the user experience of their websites. A2090-91. Nor will MotionPoint receive any compensation for

this loss, as the district court did not require TransPerfect to post a bond pending appeal. MotionPoint will never be able to recoup the funds expended in redesigning TransMotion®, any sales lost during the injunction period, and the potential diminished goodwill from MotionPoint's many customers. It was error for the district court to discount these hardships.

## CONCLUSION

The judgment should be reversed or, alternatively, vacated and the case remanded for new trial.

Respectfully submitted,

Dated: February 25, 2015    By: _____/s/ Robert W. Stone_____
                             Robert W. Stone
                             QUINN EMANUEL URQUHART &
                             SULLIVAN, LLP
                             555 Twin Dolphin Drive, 5th Floor
                             Redwood Shores, California 94065
                             Telephone: (650) 801-5000
                             Facsimile: (650) 801-5000
                             robertstone@quinnemanuel.com

                             *Attorney for Defendant-Appellant*
                             *MotionPoint Corporation*

**ADDENDUM**

# **ADDENDUM**

# **TABLE OF CONTENTS**

| | |
|---|---|
| Order Resolving Cross-Motions for Claim Construction and Summary Judgment (Dkt. 307) | A1 |
| Order on Post-Trial Motions (Dkt. 544) | A36 |
| First Amended Judgment (Dkt. 545) | A60 |
| Amended Permanent Injunction (Dkt. 543) | A62 |
| U.S. Patent No. 6,857,022 | A63 |

**United States District Court**
For the Northern District of California

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4 TRANSPERFECT GLOBAL, INC.,        No. C 10-2590 CW
   TRANSPERFECT TRANSLATIONS INT'L,
5 INC., and TRANSLATIONS.COM, INC.,     ORDER REGARDING
                                 CROSS-MOTIONS FOR
6        Plaintiffs,            CLAIM CONSTRUCTION
                                 AND SUMMARY
7     v.                           JUDGMENT (Docket
                                 No. 246)
8 MOTIONPOINT CORP.,

9        Defendant.

10 _____/

11      Plaintiffs and Counterclaim-Defendants Transperfect Global,

12 Inc., Transperfect Translations International, Inc., and

13 Translations.com, Inc. (collectively, Transperfect) and Defendant

14 and Counter-Claimant MotionPoint Corporation dispute the meaning

15 of claims in four MotionPoint patents: U.S. Patent Nos. 7,584,216

16 ('216 patent), 7,627,479 ('479 patent), 7,580,960 ('960 patent),

17 and 7,627,817 ('817 patent).  The parties also dispute the meaning

18 of claims in three Transperfect patents: U.S. Patent Nos.

19 7,207,005 ('005 patent), 6,526,426 ('426 patent), and 6,857,022

20 ('022 patent).  Finally, the parties cross-move for summary

21 judgment of non-infringement on their respective patents.  After

22 considering the parties' submissions and oral argument, the Court

23 construes the disputed terms as set forth below, denies

24 Transperfect's motion for summary judgment, and grants in part and

25 denies in part MotionPoint's cross-motion for summary judgment.

26                   BACKGROUND

27     Transperfect and MotionPoint are competing language

28 translation firms whose clients include website operators seeking

to offer content in multiple languages.  To serve these clients,
both companies rely on a cloud-oriented system known as "proxy-
based translation," which allows a website operator to offer its
content in different languages without having to create a separate
website in each language.  Using such a system, the client simply
maintains its website in a single language while the translation
firm generates, stores, and hosts a translated version of the
website on a proxy server.  Typically, the firm does this by
monitoring the client's website for content changes or updates,
copying any new content it identifies onto the proxy server, and
translating that content into the desired foreign language using
some combination of human and machine translators.  The firm then
makes the translated content available through a proxy website to
any person who seeks to access the client's website in the foreign
language.

All seven patents-in-suit disclose elements of a proxy-based
translation system.  The parties dispute the meaning of seventeen
claim terms, most of which appear multiple times in these patents.
The terms appear in claims 1-5, 7, 9-12, 14-15, 17-20, and 22-23
of Transperfect's '426 patent; claims 1-2, 4-5, and 7-8 of
Transperfect's '005 patent; claims 1, 6, 10-12, 17, 22, and 26-28
of Transperfect's '022 patent; claims 1, 11, 27, and 36 of
MotionPoint's '216 patent; claims 1, 16, 21-22, and 32-33 of
MotionPoint's '479 patent; claims 1, 14-16, and 30-32 of
MotionPoint's '960 patent; and claims 1, 10-12, 18, 20, 23, and
32-34 of MotionPoint's '817 patent.

A2

**United States District Court**
For the Northern District of California

DISCUSSION

I.   Claim Construction

    A.   Legal Standard

    The construction of a patent is a matter of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Accordingly, in construing disputed terms, the Court first looks to the words of the claims. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Generally, the Court ascribes the words of a claim their ordinary and customary meaning. Id. The Federal Circuit instructs that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313. Other claims of the patent in question can also assist in determining the meaning of a claim term. Id. at 1314. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id.

    The Federal Circuit also instructs that claims "must be read in view of the specification, of which they are a part." Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). The specification must contain a

3

1   description of the invention that is clear and complete enough to

2   enable those of ordinary skill in the art to make and use it, and

3   thus the specification is "always highly relevant" to the Court's

4   claim construction analysis.  Vitronics, 90 F.3d at 1582.

5   "Usually, [the specification] is dispositive; it is the single

6   best guide to the meaning of a disputed term."  Id.  In some

7   cases, the specification may reveal that the patentee has given a

8   special definition to a claim term that differs from its ordinary

9   meaning; in such cases, "the inventor's lexicography controls."

10  Phillips, 415 F.3d at 1316.  The specification also may reveal the

11  patentee's intentional disclaimer or disavowal of claim scope.

12  "In that instance as well, the inventor has dictated the correct

13  claim scope, and the inventor's intention, as expressed in the

14  specification, is regarded as dispositive."  Id.  However, claims

15  are not limited to the preferred embodiment described in the

16  specification.  See SRI Int'l v. Matsushita Elec. Corp. of Am.,

17  775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc; plurality opinion).

18       While emphasizing the importance of intrinsic evidence in

19  claim construction, the Federal Circuit has authorized courts to

20  rely on extrinsic evidence, which consists of "all evidence

21  external to the patent and prosecution history, including expert

22  and inventor testimony, dictionaries, and learned treatises."

23  Phillips, 415 F.3d at 1317 (quoting Markman, 52 F.3d at 980).

24  While extrinsic evidence may be useful to the Court, it is less

25  significant than intrinsic evidence in determining the legally

26  operative meaning of claim language.  Phillips, 415 F.3d at 1317-

27  18; see also C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858,

28  862 (Fed. Cir. 2004).  Furthermore, extrinsic evidence is unlikely

**United States District Court**
For the Northern District of California

4

A4

to lead to a reliable interpretation of claim language unless considered in the context of the intrinsic evidence.  Phillips, 415 F.3d at 1319.

B.    Disputed Terms of '426 and '005 Transperfect Patents

The parties dispute eight terms in Transperfect's '426 and '005 patents.  Although each of these terms appear in multiple claims, the following three claims from the '426 patent suffice to illustrate how these terms are used throughout the patent.[1]  Six of the disputed terms in appear in claim 1, which reads as follows, with the disputed terms in bold:

> A process for managing, tracking, accounting and translating multilingual electronic content in a computer environment, comprising the steps of:
> **detecting when** a document, data stream, or non-text file in a **master language** has been updated;
> notifying the **user** which corresponding documents, data streams, or non-text files in the other languages require translation;
> allowing the **user** to initiate the translation of a document, data stream, or non-text file and its constituent or dependent elements;
> converting said document, data stream, or non-text file and its constituent or dependent elements requiring translation to an **internal format**;
> **staging the translation** of said document, data stream, or non-text file and its constituent or dependent elements; and
> **dynamically routing and sequencing** said document, data stream, or non-text file and its constituent or dependent elements to the appropriate translation resources, wherein said routing and sequencing is performed according to any of: the subject matter of the document to be processed, target language of the translation, and whether draft-only or high quality is required.

---

[1] The subheadings below identify where each disputed term appears in each patent.

5

'426 patent col. 52:28-:53.  Another disputed term, "pipeline,"

appears multiple times in claim 7, which states in relevant part:

> A process for managing, tracking, accounting and
> translating multilingual electronic content in a
> computer environment, comprising the steps of:
> detecting when a document, data stream, or non-text file
> in a master language has been updated;
> notifying the user which corresponding documents, data
> streams, or non-text files in the other languages
> require translation;
> sending documents, data streams, or non-text files to be
> translated down a **pipeline**, wherein said **pipeline** is
> connected to a plurality of translation resources
> using one or more open Application Programming
> Interfaces (API);
> sending packets to translation resources through said
> Adaptor, wherein work packets are converted to the
> appropriate translation resource format before
> sending said converted work packet to said
> translation resource;
> receiving packets from translation resources through
> said Adaptor, wherein received packets are converted
> back to the work packet format and the status and
> control information are updated in said work packet
> before sending said converted received packet to said
> **pipeline**;
> wherein said one or more open API allow a variety of
> translation resources to be connected to said
> **pipeline** . . .

Id. col. 53:45-54:7.  The eighth and final disputed term in the

'426 patent, "a module for," appears throughout claim 9:

> An apparatus for managing, tracking, accounting and
> translating multilingual electronic content in a
> computer environment, comprising:
> **a module for** detecting when a document, data stream, or
> non-text file in a master language has been updated;
> **a module for** notifying the user which corresponding
> documents, data streams, or non-text files in the
> other languages require translation;
> **a module for** allowing the user to initiate the
> translation of a document, data stream, or non-text
> file and its constituent or dependent elements;

A6

> **a module for** converting said document, data stream, or
>     non-text file and its constituent or dependent
>     elements requiring translation to an internal format;
> **a module for** staging the translation of said document,
>     data stream, or non-text file and its constituent or
>     dependent elements; and
> **a module for** dynamically routing and sequencing said
>     document, data stream, or non-text file and its
>     constituent or dependent elements to the appropriate
>     translation resources, wherein said routing and
>     sequencing is performed according to any of: the
>     subject matter of the document to be processed,
>     target language of the translation, and whether
>     draft-only or high quality is required.

Id. col. 54:11-:36.  The following subsections address the

construction of these eight terms.

> 1.   "Detecting when"
>         '426: 1, 5, 7, 9, 14-15, 17, 22-23;
>         '005: 1, 4, 7.

The parties dispute the meaning of the term "detecting when,"

which describes how the translation system disclosed in

Transperfect's '426 and '005 patents identifies new content on the

original-language website.  This dispute essentially revolves

around whether the word "when" should be given its temporal

meaning (i.e., "at which time") or its conditional meaning (i.e.,

"if"), both of which are commonly recognized by many English

dictionaries.  See, e.g., Webster's 3d New Int'l Dictionary 2062

(Philip B. Gove ed., 1993).

Transperfect contends that the term should be given its

conditional meaning.  For support, it cites other uses of the term

"when" in the specification[2] and argues that, in those contexts,

the word is used "to mean 'if' and not to identify a time or

date."  Docket No. 272, Transperfect Stmt. Re: Claim Constr., at

---

[2] The specification for the '005 patent is identical to the
specification for the '426 patent in all relevant respects.

7

2.[3]   In each of the instances Transperfect cites, however, the meaning of "when" is ambiguous and the term is susceptible to either the temporal definition or the conditional definition.

MotionPoint, in contrast, relies on other language from the specification to argue that "when" must be given its narrower, temporal definition.  It highlights a sentence which states that the disclosed system will "immediately alert the Web site manager" when new or updated content is added to the original-language version of the website.  '426 patent col. 11:39-:42; '005 patent col. 11:48-:51 (emphasis added).  Critically, the specification does not state that the website manager will be "immediately" alerted if new original-language content is detected; rather, it says that the notification will occur "[i]f a document in the master language is [] updated."  '426 patent col. 11:37-38 (emphasis added); '005 patent col. 11:47-:48 (same).  This suggests that the detection of the new content occurs "immediately," because the notification itself occurs immediately.

In light of this language in the specification, the term "detecting when" must be given its temporal meaning.  See Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim

[3] MotionPoint objects to Transperfect's unauthorized submission of a supplemental post-hearing brief in support of its claim construction motion.  Because Transperfect's supplemental brief does not provide any new information or argument, this order does not rely on it.  MotionPoint's objection is therefore overruled as moot.  The Court relies only on the post-hearing submissions that it specifically requested -- namely, the parties' joint statement and Transperfect's citations to the summary judgment record.

8

A8

United States District Court
For the Northern District of California

having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning."). Because MotionPoint's proposed construction -- "monitoring as" -- does not clearly convey this meaning, the Court construes the disputed term as "discovering immediately at the time that" so that the term's temporal meaning is explicit.[4]

Transperfect requests, as an alternative, that the Court construe the term as: "detecting at some predetermined intermittent interval."  Transperfect Stmt. Re: Claim Constr. 2. Although this proposed construction would recognize the temporal meaning of "when," Transperfect has not identified any support for this particular construction in the record.  Accordingly, the Court declines to adopt this alternative.

2.    "Master language"
'426: 1, 5, 7, 9, 14-15, 17, 22-23;
'005: 1, 4, 7.

The parties initially disputed the meaning of the term "master language" but now agree that the term refers to the original language of a website that will be translated into a different language.  At the hearing, they jointly proposed that the term be construed as "reference language."  Although the Court accepts the parties' general explanation of this term, it construes the term as "original language" in order to minimize the potential for juror confusion.

---

[4] Transperfect's assertion that MotionPoint did not timely disclose its proposed construction of "detecting when" is baseless.  MotionPoint disclosed this proposed construction in the parties' joint claim construction statement, submitted on April 5, 2012, see Docket No. 120, at 3, and in one of MotionPoint's expert reports.

9

3.   "User"
      '426: 1-5, 7, 9-12, 14-15, 17-20, 22, 23;
      '005: 1, 2, 4-5, 7-8.

The parties dispute the meaning of the term "user."  While MotionPoint asserts that the term refers only to the manager of the original-language content or his or her agents, Transperfect contends that the term refers to any person who uses the translation system, regardless of whether that person manages the original-language content.  In other words, MotionPoint contends that "user" refers exclusively to the website manager employed by the client whose website requires translation, while Transperfect contends that it may refer both to the client's employees and to employees of the translation firm itself.

The specification suggests that "user" refers only to the manager of the original-language content and not to employees of the translation firm.  In describing the invention, the specification for both the '426 and '005 patents refers to the original-language website that will be translated as the "user's site."  Specifically, it states, "The user is notified of the completion of translation and the invention coordinates the delivery of the translated documents, data streams, or non-text files back to the user's site for installation and review."  '005 patent col. 2:33-:37; '426 patent col. 2:29-32 (emphasis added).  This language negates the broader construction of the term that Transperfect proposes.

Accordingly, the Court construes "user" as "manager of the original-language content or his or her agents (e.g., the website manager)."  The Court declines to adopt MotionPoint's proposed construction, "manager of the master language content (e.g.,

United States District Court
For the Northern District of California

A10

Website manager),” in light of the Court's construction of the term, “master language,” which is discussed above.

    4.   “Pipeline”
        ‘426: 7, 15, 23.

    At the hearing, the Court proposed that the term “pipeline” be construed as “a list of tasks to be performed.”  Although Transperfect acceded to this construction at the hearing, MotionPoint objected on the grounds that it lacked sufficient specificity.  However, MotionPoint failed to offer a viable alternative.

    MotionPoint's proposed construction -- “a transport layer for scheduled dispatch of documents to translation resources” -- is both convoluted and overly restrictive.  It not only introduces a confusing term, “transport layer,” but also renders the claim's subsequent reference to “translation resources” redundant.  Thus, MotionPoint's proposed construction must be rejected.

    Because MotionPoint has not raised any compelling objections or an understandable alternative to the Court's proposed construction, the Court construes “pipeline” as “a list of tasks to be performed.”

    5.   “Internal format”
        ‘426: 1, 5, 9, 14, 17, 22.

    The parties generally agree that the term “internal format,” as used in the patents, refers to the way that the invention stores original-language content before it is translated.  They disagree, however, about how to convey this meaning in plain language.

United States District Court
For the Northern District of California

11

A11

The Court construes the term as an "arrangement of digital data in a file suitable for use within the claimed system." Although Transperfect objects to the use of the word "digital," the language of patent makes clear that this is an appropriate limitation. All six of the claims that use the term, "internal format," disclose a process for "translating multilingual electronic content in a computer environment." '426 patent col. 52:30-:31, 53:14-:15, 54:12-:13, 55:7-:8, 56:4-:5, 57:2-:3 (emphasis added).

> 6.     "Staging the translation"
>         '426: 1, 5, 9, 14, 17, 22.

At the hearing, the Court proposed that the term "staging the translation" be construed as "preparing for translation." Because both parties agreed that this proposal was acceptable, the Court adopts this construction.

> 7.     "Dynamically routing and sequencing"
>         '426: 1, 5, 9, 14, 17, 22.

The parties generally agree that the term "dynamically routing and sequencing" means continually routing and sequencing original-language documents (or other types of files) in response to changing criteria. Once again, however, they disagree about how to convey this meaning in plain language.

At the hearing, the Court directed the parties to propose new language that would make clear that the disclosed translation system is capable of responding to changing criteria. MotionPoint contends that the construction must also reflect that this process occurs "in real time" because the patent's use of the word, "dynamically," suggests that this process occurs rapidly. Docket

A12

No. 271, Joint Stmt. Re: Claim Constr., at 4.  The Court agrees that the word, "dynamically," indicates that the claimed step occurs "in real time."  See Random House Dictionary (May 6, 2013, 11:30 a.m.), http://dictionary.reference.com/browse/dynamic (illustrating the meaning of the word "dynamic" with the sentence: "Dynamic Web sites contain Web pages that are generated in real time." (emphasis added)).  However, because the phrase "in real time" would not be clear in this context, the Court construes the disputed term as "routing and sequencing, with the capacity to re-route and re-sequence while operating, in response to changing criteria."

> 8.   "A module for . . ."
>       '426: 9-12, 14-15;
>       '005: 4-5.

The parties dispute whether the term "a module for . . ." represents a means-plus-function limitation that must be construed according to 35 U.S.C. § 112, ¶ 6.  Typically, a claim term that does not use the word "means" will trigger the rebuttable presumption that § 112, ¶ 6 does not apply.  However, this presumption can be rebutted if "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  CCS Fitness v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2002) (quoting Watts v. XL Sys., Inc., 232 F.3d 877, 880 (Fed. Cir. 2000)).  This "issue often reduces to whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged

13

in means-plus-function claiming."  <u>Inventio AG v. ThyssenKrupp</u>
<u>Elevator Americas Corp.</u>, 649 F.3d 1350, 1357 (Fed. Cir. 2011).

Here, the patents' claims recite function without reciting any definite structure.  The relevant claims do not identify any specific hardware or software for performing the functions listed in each claim.  Instead, they refer simply to an "apparatus . . . comprising: a module for" performing those functions.  These generic references do not recite a sufficiently definite structure.

Although MotionPoint correctly asserts that "a module for . . ." must be construed as a means-plus-function limitation, its briefs do not identify a specific structure to which the term should be limited.  At the hearing, MotionPoint suggested that the Court adopt, for each use of the term, the structure it proposed for that term in the appendix to the parties' joint claim construction statement.  <u>See</u> Docket No. 120, Ex. A, at 37-47.  The Court has reviewed these proposed structures and agrees.  Accordingly, it construes each use of "a module for . . ." as a means-plus-function limitation with the function and structure proposed for each use by MotionPoint in the joint claim construction statement.

C.    Disputed Terms of '022 Transperfect Patent

At the hearing, the parties disputed two terms in Transperfect's '022 patent.  The first disputed term, "obtaining a translation," appears once in claim 1 and twice in claim 17.  The following excerpt offers an example of how the term is used:

A single-action translation ordering system comprising: a single action translation component displayed simultaneously with at least part of an electronic

14

**United States District Court**
For the Northern District of California

communication comprising at least text of more than
one word and one or more hyperlinks to further
electronic communications, said translation component
comprising an object identified as effecting a
translation of said electronic communication in a
single action;
a communication network; and
a translation manager in communication with said single
action translation component via said communication
network;
said translation manager:
  **obtaining a translation** of said electronic
  communication in response to a user clicking said
  single action translation component;
  directing transmission of said translation of said
  electronic communication to said user; and
  providing translation of said further electronic
  communications when said hyperlink is activated;
  by delivering a translation of said further
  electronic communications that was translated when
  said electronic communication was translated; or
  by **obtaining a translation** of said further electronic
  communications when said hyperlink is activated.

'022 patent col 8:51-9:10.  The other disputed term in the '022

patent appears only once, in claim 22:

   The system of claim 17 wherein said translation
   manager includes **means for effecting automatic
   translation of said communication.**

Id. col. 10:31-:33.

   Prior to the hearing in this matter, the parties reached an

agreement to construe the term "effecting a translation," which

occurs in claims 1 and 17, as "bringing about a translation."

They also agreed that the term "translation manager," which they

previously disputed, does not require construction.

            1.   "Obtaining a translation"
                 '022: 1, 17

   The parties dispute the meaning of the term "obtaining a

translation."  Both parties agree that the term refers to the

translation system's process for translating new content from an

original language into a different language.  They disagree,

however, about whether the term also refers to the process of

15

A15

retrieving previously translated content that was rendered in response to a prior translation request.  MotionPoint contends that all content must be translated anew, including content that has already been translated, while Transperfect asserts that the invention is capable of recognizing and recalling content that has already been translated.

The specification contemplates at least one preferred embodiment of the system that can retrieve previously translated content without re-translating it.  The specification explains that this feature would make the system more efficient.  To illustrate this point, it highlights the example of a news website with "static heading content but dynamic news content."  '022 patent col. 3:23-:25.  The patent notes that, using one embodiment of the translation system, "the static content can be translated once and cached whereas the dynamic content must be translated each time a translation is requested."  Id.  MotionPoint's narrow construction of "obtaining a translation" would exclude this preferred embodiment and must therefore be rejected.  See SEB S.A. v. Montgomery Ward & Co., Inc., 594 F.3d 1360, 1369 (Fed. Cir. 2010).  While MotionPoint highlights another preferred embodiment of the invention that could make "recommendations on which pages should be permanently translated and into which languages," this does not necessarily preclude embodiments of the system that would perform permanent translations of certain pages automatically so as to avoid repeated translations of the same content.  What's more, as noted above, the preferred embodiment of an invention should not be used to impose limitations on disputed claim terms. See SRI Int'l, 775 F.2d at 1121.

16

A16

Accordingly, the Court construes the term "obtaining a translation" as "bringing about a new or retrieving an existing translation."

> 2.   "Means for effecting automatic translation of said communication"
> '022: 22

Although the parties initially disputed this term, they have since reached an agreement to construe the term as a means-plus-function limitation with the following function and structure:

> Function: effecting automatic translation of said communication.

> Structure: translation engines or software programs; translation sites with translation engines or software programs.

The Court finds the parties' joint proposal reasonable and therefore adopts their proposed construction.

> D.   Disputed Terms of '216, '479, '817, and '960 MotionPoint Patents

The parties dispute the meaning of seven claim terms that appear in MotionPoint's four patents.  The following four claims -- one from the '216 patent, two from the '479 patent, and one from the '960 patent -- illustrate how these disputed terms are used throughout MotionPoint's patents.

The first disputed claim term, "human translation," appears throughout MotionPoint's '216, '960, and '479 patents.  Claim 1 of the '479 patent offers an example of how the term is used:

> A machine implemented method for managing language translation, comprising the steps of:
> crawling an origin web site hosting content in a first language via following publicly accessible links to additional pages;
> identifying a portion of the content in the first language that is not yet translated to the second language; . . .

United States District Court
For the Northern District of California

17

A17

translating the translatable components into a second
    language using **human translation**; . . .

'479 patent col. 32:31-:50.

Claim 1 of the '216 patent exemplifies three more disputed

terms:

A machine implemented method for providing translated
web content, comprising the steps of:
receiving a first request from a user for content in a
    second language translated from content in a first
    language from a first Internet source;
retrieving the content in the first language from the
    first Internet source;
**dividing** the content in the first language into a
    plurality of translatable components, wherein a
    translatable component includes a **segment of text**;
determining whether there are translatable components
    for which no corresponding translation is found in a
    database that stores translations for translatable
    components generated previously;
**scheduling** for translation of translatable components
    that do not have corresponding translations in the
    database and using a human translator to translate
    each translatable component into the second language,
    wherein each segment of text is translated as a unit;
storing into the database the translations of the
    translatable components as translatable components;
receiving a second request from a user for the
    translated content in the second language
    corresponding to the content in the first language
    from the first Internet source;
retrieving the content in the first language from the
    first Internet source;
**dividing** the received content in the first language into
    a plurality of translatable components;
generating the translated content in the second language
    by modifying the received content in the first
    language so that each translatable component is
    replaced with a corresponding translated component
    stored in the database; and
sending the translated content to the user as a response
    to the second request.

'216 patent col. 32:51-33:19.

Claim 30 of the '479 patent provides another disputed term:

A machine implemented method for managing language
translation, comprising the steps of: **scheduling content
in a first language for translation by storing content**
in the first language accessed via following publicly
accessible links from a web server that hosts the
content in the first language . . . .

18

1  '479 patent col. 35:55-:60.

2      And claim 1 of the '960 patent discloses the final disputed

3  term:

4      A machine implemented method for **synchronizing** content
       in different languages, comprising the steps of:
5      accessing from a web server via a publicly available
       network path, content in a first language, including
6      content retrieved by crawling a website . . . .

7  '960 patent col. 32:36-:41.

8              1.   "Human translation"
                    '960: 4, 19, 35
9                   '479: 1, 16, 21, 30
                    '216: 20
10

11      MotionPoint's '216, '960, and '479 patents all feature claims

12  that use the term "human translation."  Transperfect contends that

13  this term is indefinite because MotionPoint's patents disclose a

14  machine-based translation system and, thus, the patents' claims

15  should be "limited to steps or functions performed without human

16  intervention."  Transperfect Mot. Claim Constr. & Summ. J. 14.

17      This argument ignores the plain language of the patent

18  specifications.  Each of MotionPoint's patents expressly

19  contemplates human involvement at the translation stage.  Indeed,

20  the specifications make clear that one of the principal benefits

21  of proxy-based translation systems over machine-only translation

22  systems is the ability to obtain more readable translations by

23  using human translators.  The '216 patent states, "The present

24  invention is further advantageous because it allows for the use of

25  human translation, thereby producing a high quality translation of

26  the original web site in another language.  This is beneficial as

27  it reduces or avoids the use of machine translation, which can be

28  of low quality."  '216 patent col. 4:1-:5.  The '960 and '479

19

A19

**United States District Court**
For the Northern District of California

patents similarly recognize that human translation could be used
to complement machine translation within the disclosed translation
systems.  '479 patent col. 21:16-:19 ("The translation server 400
can use real-time machine translation in the event that a human
translation is not yet available for a text segment."); '960
patent col. 21:23-:25 (same).  Thus, while MotionPoint's patents
rely exclusively on computers at other stages of the process --
for instance, in retrieving data from an original-language website
or dividing that data into text and image files -- they expressly
acknowledge that humans may play a role at the language
translation stage.  In short, ample intrinsic evidence shows that
the term, "human translation," is not indefinite.  The Court
therefore construes the term according to its plain and ordinary
meaning, namely, as "translation performed by a human."

        2.   "Segment of text"
          '216: 1, 27, 36

Transperfect argues that the term "segment of text" should be
construed as a "chunk of text on the page as defined by the HTML
that surrounds it."  It bases its proposed construction on the
'216 patent specification, which states, "A text segment is a
chunk of text on the page as defined by the HTML that surrounds
it."  '216 patent col. 11:60-:62.  MotionPoint contends that this
language does not control and that Transperfect's proposed
construction -- particularly the reference to HTML -- is unduly
narrow.

Because the specification provides a clear definition of the
disputed term, the "inventor's lexicography controls."  Phillips,
415 F.3d at 1316.  MotionPoint's reliance on extrinsic evidence to

20

A20

define the term more broadly is unavailing as is its contention

that someone of ordinary skill in the art would understand

"segment of text" to mean something other than the definition

provided in the specification.  The Federal Circuit has

specifically held that the specification's definition is

dispositive even when it "reveal[s] a special definition given to

a claim term by the patentee that differs from the meaning it

would otherwise possess." Id.  Contrary to MotionPoint's

assertion at the hearing, an inventor is not required to provide

"a statement in the form of 'I define _____ to mean _____'" in

order to define or re-define a specific term in the patent.

Astrazeneca AB v. Mutual Pharm. Co., 384 F.3d 1333, 1339 (Fed.

Cir. 2004) (holding that "such rigid formalism is not required");

see also  Bell Atl. Network Servs., Inc. v. Covad Communications

Group, Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term

may be clearly redefined without an explicit statement of

redefinition.").

    Other references to "text segments" in the patent also

indicate that HTML constitutes part of the term's definition.  For

instance, the patent states that the "parsing system is flexible

and allows defining, on per-customer basis, which HTML tags are

formatting tags that should not break up text segments." '216

patent col. 12:22-:23 (emphasis added); see also '216 patent col.

12:18-:19 ("By default, the parsing system breaks-up text segments

according to the HTML tags in the page.").  These repeated

references to the "HTML tags" of "text segments" further support

the inventor's definition of the term.

United States District Court
For the Northern District of California

21

A21

United States District Court
For the Northern District of California

1    MotionPoint's contention that the doctrine of claim

2    differentiation requires a broader construction of the term is

3    unavailing.  The Federal Circuit has expressly held that "the

4    doctrine of claim differentiation does not allow unrestrained

5    expansion of claims beyond the description of the invention in the

6    specification."  Tandon Corp. v. United States ITC, 831 F.2d 1017,

7    1024, 1028 (Fed. Cir. 1987).  The court has repeatedly recognized

8    that the "doctrine of claim differentiation creates only a

9    presumption, which can be overcome by strong contrary evidence

10   such as definitional language in the patent."  InterDigital

11   Communications, LLC v. Int'l Trade Comm'n, 690 F.3d 1318, 1324

12   (Fed. Cir. 2012); see also Black & Decker, Inc. v. Robert Bosch

13   Tool Corp., 260 Fed. App'x 284, 290 (Fed. Cir. 2008) (rejecting

14   the district court's reliance on the doctrine of claim

15   differentiation because "the presumption of scope applied to the

16   independent claims under the doctrine of claim differentiation

17   here does not overcome the definition from the intrinsic record").

18   In the present case, the '216 patent's clear definition of

19   "segment of text" rebuts any presumption created by the doctrine

20   of claim differentiation.[5]

21

22

23        [5] It is not clear that the doctrine of claim differentiation even
     supports a broader construction of the disputed term here.  The
24   dependent claim that MotionPoint cites -- claim 11 -- does not use the
     term "segment of text" at all but, rather, uses the broader term,
25   "translatable components," when discussing non-HTML "markup tag[s]."
     '216 patent col. 33:57-:59.  Because another claim in the patent --
26   claim 8 -- makes clear that the term "translatable components"
     encompasses not only "text segment[s]" but also "image file[s]," "audio
27   clip[s]," and "video clip[s]," id. 33:40-:47, claim 11 cannot be read to
     eliminate the HTML-based limitation from the patent's definition of
28   "segment of text."

22

A22

United States District Court
For the Northern District of California

1   Accordingly, the Court construes "segment of text" as "a
2   chunk of text on the page as defined by the HTML that surrounds
3   it."

4         3.   "Dividing," "Parsing," and "Parsed"
               '960: 1, 14, 15, 16, 30, 31, 32;
5              '216: 1, 11, 24, 27, 36;
               '817: 1, 10-12, 18, 20, 23, 32-34
6
7   Transperfect contends that the terms "dividing," "parsing,"
8   and "parsed" should all be construed as "breaking-up the content
9   into translatable components according to HTML tags surrounding
10  each translatable component."  Once again, Transperfect bases its
11  proposed construction on the patent specifications, which state,
12  "Parsing is the process of breaking-up an HTML page submitted for
13  translation into its translatable and non-translatable
14  components."  '216 patent col. 11:46-48; '960 patent col. 11:51-
15  :53; '817 patent col. 11:51-:53.  MotionPoint argues that this
16  language does not control and that Transperfect's proposed
17  construction is too narrow.  Specifically, MotionPoint argues that
18  "dividing," "parsing," and "parsed" should not be construed to
19  apply only to "HTML page[s]" because such a construction would

20  _____
21        Another dependent claim -- claim 26, which MotionPoint fails to
    cite -- provides a slightly stronger basis for invoking the doctrine of
22  claim differentiation; however, it still does not justify eliminating
    the HTML-based limitation from the definition of "segment of text."
23  Claim 26 reads: "The method according to claim 1, wherein the plurality
    of translatable components include a text segment enclosed in an
24  attribute of an HTML tag."  Id. 34:59-:61.  The specification makes
    clear that an "attribute of an HTML tag" is merely a specific kind of
25  HTML tag.  Thus, this claim -- the only claim in the entire '216 patent
    that even mentions HTML -- does not preclude the Court from including
26  any HTML-based limitations in its construction of "text segment"; it
    simply precludes the Court from including a specific kind of HTML-based
27  limitation (namely, an "attribute of an HTML tag") in its construction
    of "text segment."  Accordingly, claim 26 does not require a broader
28  construction of "segment of text" (or "text segment") under the doctrine
    of claim differentiation.

                              23

A23

**United States District Court**
For the Northern District of California

1  undermine the patents' statement that the "parsing system is

2  flexible." '216 patent col. 12:22-:23; '960 patent col. 12:25-

3  :27; patent col. 12:27-:29.

4      While MotionPoint is correct that the specifications

5  contemplate some flexibility in the parsing system, this

6  flexibility does not preclude Transperfect's proposed

7  construction.  If anything, the sentence on which MotionPoint

8  relies appears to confirm that the patent uses the terms

9  "dividing," "parsing," and "parsed" to describe the division of

10 content based on HTML tags.  The full sentence reads: "The parsing

11 system is flexible and allows defining, on per-customer basis,

12 which <u>HTML tags</u> are formatting tags that should not break up text

13 segments." '216 patent col. 12:22-:23; '960 patent col. 12:25-

14 :27; patent col. 12:27-:29 (emphasis added).  Thus, the parsing

15 system's flexibility does not undermine Transperfect's proposed

16 construction.

17     MotionPoint next argues that Transperfect's proposed

18 construction is precluded by the doctrine of claim

19 differentiation.  Once again, however, this argument fails because

20 it would require an "expansion of claims beyond the description of

21 the invention in the specification." <u>Tandon Corp.</u>, 831 F.2d at

22 1028.  The patents' express definition of "parsing" renders the

23 doctrine of claim differentiation inapplicable here.

24 <u>InterDigital</u>, 690 F.3d at 1324.  Furthermore, even if the doctrine

25 did apply, it would not preclude the Court from including "HTML

26 tags" within its construction of the terms "parsing" and

27 "dividing."  The dependent claims in the '817 or '960 patents do

28 not even mention HTML and, thus, cannot reasonably be read to

A24

eliminate the term from the definition of "parsing" or dividing" in the independent claims.

The Court therefore adopts the inventor's own lexicography and construes the terms "dividing," "parsing," and "parsed" as "breaking-up the content according to HTML tags."

> 4.    "Synchronizing" and "Synchronized"
>       '960: 1, 16, 32

Transperfect contends that the terms "synchronizing" and "synchronized" should be construed as "modified/modifying to make the same as."  MotionPoint contends that this proposed construction does not accurately capture the meaning of "synchronized" as the term is used in claim 1 of the '960 patent. That claim describes how "updated content in the second language is synchronized with the accessed content in the first language." '960 patent col. 32:60-:61.  MotionPoint notes that, under the disclosed translation process, some of the "updated content in the second language" may have already been modified to match content in the first language and, in that situation, would not need to be modified again.

To accommodate this situation that MotionPoint highlights, the Court adopts an amended version of Transperfect's proposed construction.  Rather than construing the terms "synchronizing" and "synchronized" as "modified/modifying to make the same as," the Court construes the terms as "modified/modifying, if necessary, to make the same as."  Transperfect agreed at the hearing that it found this amendment acceptable.

**United States District Court**
For the Northern District of California

25

United States District Court
For the Northern District of California

             5.   "Scheduling"
                  '216: 1, 27, 36;
                  '479: 1, 16, 21-22, 32-33

     Both the '216 and '479 patents use the term "scheduling" to
describe how certain original-language content is placed in a
queue for translation.  The parties dispute whether this content,
under the disclosed translation inventions, must be translated in
the same order in which it appears in the queue.  MotionPoint
asserts that the content need not be translated in any specific
order; Transperfect, in contrast, argues that the content must be
translated in the same sequence in which it appears in the queue.
Transperfect also contends that the disclosed inventions must
identify the exact dates and times when every item in the queue
will ultimately be translated.

     MotionPoint's proposed construction ignores the plain and
ordinary meaning of the word "schedule," which typically refers to
a sequential order of events.  See, e.g., Random House Dictionary
(May 6, 2013, 2:20 p.m.), http://dictionary.reference.com/browse/
schedule?s=t (defining "schedule" as "a plan of procedure, usually
written, for a proposed objective, especially with reference to
the sequence of and time allotted for each item or operation
necessary to its completion" (emphasis added)).  Because
MotionPoint does not provide any compelling reasons to deviate
from this traditional definition, its proposed construction must
be rejected.

     So, too, must Transperfect's proposed construction.  Although
Transperfect at least recognizes that "scheduling" includes a
sequential component, its proposed construction is overly
restrictive.  It would require that the claimed inventions

A26

identify precise dates and times when every item in the queue will be translated even though nothing in the patents supports such a narrow construction of the term "scheduling." Transperfect's reliance on the patent specifications is unavailing. While the specifications describe how a web crawling program can be used to check an original-language website for updates at specific times of day, they do not suggest that content stored on the queue is subsequently scheduled for translation at specific dates and times. What's more, even if the description of the web crawling schedule did apply to the translation schedule, it cannot be read as a claim limitation because the specification makes clear that this description is merely illustrative. The specification states, "For <u>example</u>, if the ABC Widgets web site modifies its sale offerings twice a week, such as on Mondays and Fridays at 12 AM, then the spider agent 404 <u>can</u> be scheduled to crawl the relevant parts of the site shortly after (e.g., at 12:30 AM) on those days." '216 patent col. 28:50-:55; '479 patent col. 28:30-:35 (emphases added). This isolated illustration of the web crawling stage does not support Transperfect's narrow construction of claims describing an entirely different stage of the process.

Thus, in light of both the specifications and the plain meaning of the term, the Court construes "scheduling" as "placing onto a list for translation in a specified sequence."

      6.    "Scheduling content in a first language by storing content"
              '479: 30-32

Transperfect argues that this term is indefinite because the words "scheduling" and "storing," as used in the patent,

United States District Court
For the Northern District of California

27

effectively mean the same thing: that is, placing original-language content in a queue for subsequent translation.

This argument is unpersuasive because "scheduling" and "storing" have different meanings in the context of the disputed claim. As noted above, "scheduling" refers to the process of "placing [content] onto a list for translation in a specified sequence." The word "storing," in contrast, refers to the specific location of that list: in this case, the translation queue. Transperfect's effort to conflate these two definitions is insufficient to render the disputed claim term indefinite. As the Federal Circuit has held, claims should only be deemed indefinite if they are "insolubly ambiguous." Exxon Research & Engineering Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Thus, based on the term's plain and ordinary meaning in the context of the '479 patent, the Court construes "scheduling content in a first language by storing content" as "scheduling content in a first language for translation by storing that content in a translation queue."

> 7.    "Retrieving the content in the first language from the first Internet source"
> '216: 1, 27, 36

The term, "retrieving the content in the first language from the first Internet source," describes one of a series of steps, which are listed in each of the claims where the term appears. The parties initially disputed whether these steps, in the disclosed invention, must be performed in the order in which they are listed in the patent. They have since resolved this dispute, however, by agreeing that certain steps must be performed in the order in which they are listed. Specifically, the parties now

United States District Court
For the Northern District of California

A28

1  agree that the step of "receiving a first request from a

2  user . . ." and the following step of "retrieving the content in

3  the first language . . ." must precede the step of "receiving a

4  second request from a user . . ." and the following step of

5  "retrieving the content in the first language."  The Court adopts

6  this construction in light of the parties' agreement.

7  II.   Summary Judgment

8        A.   Legal Standard

9        Summary judgment is properly granted when no genuine and

10  disputed issues of material fact remain, and when, viewing the

11  evidence most favorably to the non-moving party, the movant is

12  clearly entitled to prevail as a matter of law.  Fed. R. Civ.

13  P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

14  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

15  1987).

16       The moving party bears the burden of showing that there is no

17  material factual dispute.  Therefore, the court must regard as

18  true the opposing party's evidence, if supported by affidavits or

19  other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

20  815 F.2d at 1289.  The court must draw all reasonable inferences

21  in favor of the party against whom summary judgment is sought.

22  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

23  587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952

24  F.2d 1551, 1558 (9th Cir. 1991).

25       Material facts which would preclude entry of summary judgment

26  are those which, under applicable substantive law, may affect the

27  outcome of the case.  The substantive law will identify which

28  facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S.

**United States District Court**
For the Northern District of California

A29

242, 248 (1986).  Where the moving party does not bear the burden

of proof on an issue at trial, the moving party may discharge its

burden of production by either of two methods:

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d

1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an

absence of evidence to support an essential element of a claim or

defense, it is not required to produce evidence showing the

absence of a material fact on such issues, or to support its

motion with evidence negating the non-moving party's claim.  Id.;

see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990);

Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If

the moving party shows an absence of evidence to support the non-

moving party's case, the burden then shifts to the non-moving

party to produce "specific evidence, through affidavits or

admissible discovery material, to show that the dispute exists."

Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an

essential element of the non-moving party's claim or defense, it

must produce affirmative evidence of such negation.  Nissan, 210

F.3d at 1105.  If the moving party produces such evidence, the

burden then shifts to the non-moving party to produce specific

evidence to show that a dispute of material fact exists.  Id.

United States District Court
For the Northern District of California

30

A30

1    If the moving party does not meet its initial burden of

2 production by either method, the non-moving party is under no

3 obligation to offer any evidence in support of its opposition.

4 Id.  This is true even though the non-moving party bears the

5 ultimate burden of persuasion at trial.  Id. at 1107.

6    B.    Transperfect's Motion for Summary Judgment

7    Transperfect moves for summary judgment that it has not

8 infringed MotionPoint's patents.  It argues that, because human

9 engineers play a vital role at the "parsing" stage of its

10 translation process (i.e., when the website content is divided

11 into translatable components), it cannot have infringed the

12 MotionPoint patents, which disclose a fully automated, machine-

13 based parsing process.

14    To support this assertion, Transperfect submits statements

15 from MotionPoint's expert, Dr. Chase, whose invalidity report

16 describes how MotionPoint's parsing process is fully automated and

17 does not typically require human involvement.  See Lee Decl., Ex.

18 14, at ¶¶ 39-42.  Transperfect also cites statements from its own

19 expert, Dr. Paul Clark, and one of its developers, Joseph Kuefler,

20 describing how Transperfect relies heavily on human engineers to

21 parse its clients' web content into translatable components.  See

22 Lee Decl., Ex. 15, at ¶¶ 63, 200; Ex. 16, Kuefler Dep. 257:14-:22.

23    MotionPoint disputes Transperfect's characterization of its

24 parsing process and asserts that much of Transperfect's parsing

25 process is actually performed by web crawling software.  For

26 support, it points to statements made by Kuefler, who, during his

27 deposition, expressly stated that the dividing process was done by

28 "[s]oftware, for the most part."  Declaration of Gregory C.

United States District Court
For the Northern District of California

31

A31

Wyckoff, Ex. 5, 78:14-79:1.  MotionPoint also cites excerpts from

Dr. Chase's expert report in which he explains how some of the

human engineers who participate in Transperfect's parsing process

are actually tasked with improving the automated elements of that

process -- not with parsing the content themselves.  <u>See</u> Wyckoff

Decl., Ex. 2, Chase Dep. 311:2-312:13.

Thus, MotionPoint has produced sufficient evidence to create

a genuine dispute of fact as to whether Transperfect's parsing

process involves significant automated elements that infringe

MotionPoint's patents.  Transperfect's summary judgment motion

must therefore be denied.

C.    MotionPoint's Cross-Motion for Summary Judgment

MotionPoint cross-moves for summary judgment that it has not

infringed Transperfect's patents.  It contends that its

translation system lacks key features of the translation

inventions disclosed in Transperfect's patents and, thus, does not

infringe those patents.

1.    '426 and '005 Patents

Transperfect alleges that MotionPoint's translation system

infringes the '426 and '005 patents by intermittently crawling its

clients' websites to check for changes in original-language

content.  MotionPoint does not dispute this characterization of

its crawling system but, rather, argues that the system does not

infringe because it differs in at least one respect from the

crawling system disclosed by Transperfect's patents.

Specifically, MotionPoint notes that Transperfect's patents

disclose a system that monitors its users' original-language

content <u>constantly</u> and detects changes in that content

32

A32

**United States District Court**
For the Northern District of California

1    <u>immediately</u>.  In contrast, MotionPoint's own system only crawls

2    its clients sites and detects content changes <u>intermittently</u>.

3    Although Transperfect contends that its '426 and '005 patents

4    disclose a system that monitors original-content intermittently,

5    the Court specifically rejected this argument in construing the

6    relevant patent terms.  Accordingly, Transperfect's evidence does

7    not support an inference of infringement based on MotionPoint's

8    crawling system.

9        Nor has Transperfect produced sufficient evidence to support

10   a claim of infringement based on MotionPoint's system of notifying

11   its clients about the status of their translation requests.  As

12   noted above, the translation system disclosed by Transperfect's

13   patents notifies the user -- that is, the manager of the original-

14   language website -- when certain original-language content

15   requires translation.  See '426 patent col. 52:34; '005 patent

16   col. 53:43.  Although Transperfect asserts that MotionPoint's

17   translation system provides its clients with similar

18   notifications, the evidentiary record suggests otherwise.

19   MotionPoint's expert, Dr. Paul Clark, asserts that MotionPoint's

20   translation system does not notify MotionPoint's clients when

21   content requires translation but, instead, only notifies

22   MotionPoint's own employees and subcontractors.  See Wyckoff

23   Decl., Ex. 9, at ¶ 53.  Although Transperfect has highlighted

24   another section of Dr. Clark's report stating that MotionPoint's

25   clients have access to the translation system, this is not the

26   same as automatic notice because it requires clients to check for

27   themselves whether any content requires translation.  Thus,

28

33

A33

**United States District Court**
For the Northern District of California

1  MotionPoint's notification system does not infringe Transperfect's

2  patents.

3      Because Transperfect has failed to produce sufficient

4  evidence to support an inference of infringement, MotionPoint is

5  entitled to summary judgment of non-infringement of the '426 and

6  '005 patents.

7          2.   '022 Patent

8      Transperfect alleges that MotionPoint infringes its '022

9  patent by providing a single-action translation option on its

10 clients' websites.  For support, it provides several images of

11 English-language websites maintained by MotionPoint's clients.

12 Wyckoff Decl., Ex. 11.  Each of these websites features links to

13 non-English versions of these websites, images of which

14 Transperfect has also provided.  Id.  Transperfect has also

15 submitted internal MotionPoint documents that describe how website

16 visitors are able to click on a link on a client's website in

17 order to obtain a translation of that webpage.  Eisenberg Decl.,

18 Ex. 7, TransMotion Web Site Language Layering Technology:

19 Integration Guide, at 8-9.  Taken together, these documents are

20 sufficient to support a claim of infringement.  Although

21 MotionPoint argues that these documents do not demonstrate that it

22 actually infringes the '022 patent, they are still sufficient to

23 raise material dispute of fact.  Accordingly, MotionPoint's motion

24 for summary judgment of non-infringement must be denied with

25 respect to the '022 patent.

26                      CONCLUSION

27     For the reasons set forth above, the Court construes the

28 disputed claim language in the manner explained; DENIES

                          34

A34

1  Transperfect's motion for summary judgment of non-infringement

2  (Docket No. 246); and GRANTS in part and DENIES in part

3  MotionPoint's cross-motion for summary judgment of non-

4  infringement (Docket No. 251).  The parties are directed to meet

5  with a private mediator within twenty-one days of this order.

6       IT IS SO ORDERED.

7

8  Dated:  May 24, 2013                _____
                                       CLAUDIA WILKEN
9                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

35

A35

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSPERFECT GLOBAL, INC.; TRANSPERFECT TRANSLATIONS INTERNATIONAL, INC.; and TRANSLATIONS.COM, INC., | No. C 10-2590 CW |
| | ORDER ON POST-TRIAL MOTIONS (Docket Nos. 439, 440, 444, 445, 486, 489 and 509). |
| Plaintiffs, | |
| v. | |
| MOTIONPOINT CORPORATION, | |
| Defendant. | |

_____/

Plaintiffs and Counterclaim-Defendants TransPerfect Global, Inc.; TransPerfect Translations International, Inc.; and Translations.com, Inc. (collectively, TransPerfect) seek the following relief in their post-trial motions: (1) an order severing TransPerfect's Lakritz patent claims from the remainder of the case; (2) increased and supplemental damages and pre-judgment interest; (3) an amended permanent injunction against MotionPoint; (4) judgment as a matter of law (JMOL) that MotionPoint indirectly infringes its patent; and (5) attorneys' fees. Defendant and Counter-Claimant MotionPoint Corporation opposes all of these motions and cross-moves for JMOL that the asserted claims of TransPerfect's Scanlon patent are invalid and not infringed, that TransPerfect's damages award should be reduced, and that its own patents are valid and infringed. For the reasons set forth below, the Court GRANTS TransPerfect's motion to amend the permanent injunction and its motion for post-

verdict royalties and pre-judgment interest; all other motions are DENIED.

<div align="center">BACKGROUND</div>

TransPerfect and MotionPoint are competing language translation firms which brought claims against each other for patent infringement. Prior to trial, the Court granted summary adjudication that MotionPoint did not infringe TransPerfect's Lakritz patents. The Court held a three-week jury trial on the remaining claims in July 2013.

With respect to TransPerfect's infringement claims, the jury returned a verdict finding that MotionPoint's accused product, called the TransMotion system, directly infringed six claims of TransPerfect's Scanlon patent. The jury also found, however, that MotionPoint was not liable for inducing infringement or contributory infringement.

With respect to MotionPoint's infringement claims, the jury found that TransPerfect had not infringed any claims of MotionPoint's three patents-in-suit. In addition, it found that the asserted claims of all three of MotionPoint's patents-in-suit were invalid as obvious, anticipated, and statutorily barred.

The jury awarded TransPerfect total damages of $1,002,006. It found and used a reasonable royalty rate of four percent to calculate these damages. Docket No. 415, Verdict Form.

In August and September 2013, the parties filed a series of post-trial, pre-judgment motions. Both parties renewed the motions for JMOL that they had made during trial. In addition, TransPerfect moved for a permanent injunction and to sever, from the claims that went to trial, its Lakritz patent claims, upon

United States District Court
For the Northern District of California

2

A37

1  which the Court earlier granted summary judgment of non-
2  infringement by MotionPoint.  The parties pointed out that they
3  planned to file additional post-trial motions after the Court
4  entered judgment and determined whether to issue a permanent
5  injunction.  The Court deferred its decision on the parties' post-
6  trial motions, entered judgment, and issued a permanent
7  injunction, but stayed its injunction pending resolution of the
8  post-trial and post-judgment motions.

9                              DISCUSSION
10  I.    TransPerfect's Post-Trial Motions (Docket Nos. 439, 440,
          445, 489, and 509)

11
12        A.    TransPerfect's Motion to Sever Lakritz Patent Claims
                (Docket No. 445)
13
14        In May 2013, the Court granted summary judgment of non-
15  infringement to MotionPoint on all of TransPerfect's claims based
16  on its Lakritz patents.  TransPerfect moves to sever these claims
17  for a separate appeal from the claims that were decided at trial.

18        Federal Rule of Civil Procedure 21 provides, "On motion or on
19  its own, the court may at any time, on just terms, add or drop a
20  party.  The court may also sever any claim against a party."  The
21  court may sever the claims against a party in the interest of
22  fairness and judicial economy and to avoid prejudice, delay or
23  expense, and has "broad discretion" in determining when severance
24  is appropriate.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1296-
25
26  97 (9th Cir. 2000).

27        TransPerfect seeks severance of its claims of infringement of
28  its Lakritz patents in order to allow for separate appeals of

United States District Court
For the Northern District of California

3

A38

those claims and the claims decided at trial, arguing that doing so would avoid certain possible undesirable future outcomes resulting from the Federal Circuit's decision in Fresenius USA, Inc. v. Baxter International, Inc., 721 F.3d 1330 (Fed. Cir. 2013).

The Court is not persuaded.  This case has been adjudicated in full and can be appealed to the Federal Circuit in a single appeal.  There is no good reason to divide the case in two and proceed with two separate appeals.  Consequently, Plaintiffs' motion to sever Lakritz patent claims is DENIED.

B.   Motion for JMOL on Marking Defense or New Trial on Damages (Docket No. 439)

At trial, MotionPoint argued that TransPerfect's damages claim should be limited because neither it nor the predecessor owner of its Scanlon patent had marked the products they produced embodying the patent, and that they were required to do so.  As a result, MotionPoint argued, damages could be awarded only from October 13, 2011, the date TransPerfect added claims based on the Scanlon patent to this case.

The jury was instructed that if a patent holder does not sell a tangible product that is capable of being marked, then damages commence on the date that the infringer began infringing an issued patent.  If the patent holder does sell a tangible product that is capable of being marked, then damages commence on the date that the alleged infringer has both infringed and been notified of the

4

A39

patent.  The jury was further instructed that the patent holder must prove by a preponderance of the evidence the date on which it gave notice and that the matter was for the jury to decide.

As noted above, the jury returned a verdict for TransPerfect of $1,002,006, indicating that it had used a four percent royalty rate in calculating that amount.  The verdict amount is four per cent of about twenty-five million dollars, which is not a number put forward by either side.  TransPerfect speculates that the jury reached this number by finding that TransPerfect's products, and those of its predecessor, had not been marked.  TransPerfect argues that such a finding was incorrect as a matter of law.

However, it is not at all clear how the jury reached the damage award.  The jury was instructed on lost profits damages and on a reasonable royalty.  It was told that if the patent-holder proved its claim for lost profits for only a portion of the infringing sales, then it should be awarded a reasonable royalty for all infringing sales for which it was not awarded lost profits damages.  The verdict form called for a total amount of damages, and then for any reasonable royalty rate it used to calculate these damages.  This does not necessarily mean that all of the damages were based on that royalty.  The jury could have awarded damages consisting in part of lost profits and in part of a four percent royalty on infringing sales for which it did not award lost profits.

5

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nonetheless, even if the jury did take MotionPoint's marking defense into account, the verdict need not be overturned.  There was a dispute of fact as to whether TransPerfect's product could be viewed as a tangible one that could have been marked, on its web pages or on the resulting translations.  There was sufficient evidence for the jury to decide the issue and, under proper instructions, it did so.

A motion for judgment as a matter of law after the verdict renews the moving party's prior Rule 50(a) motion for judgment as a matter of law at the close of all the evidence.  Fed. R. Civ. P. 50(b).  Judgment as a matter of law after the verdict may be granted only when the evidence and its inferences, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion as to the verdict.  Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006).  Where there is sufficient conflicting evidence, or where reasonable minds could differ over the verdict, judgment as a matter of law after the verdict is improper.  See, e.g., Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 775 (9th Cir. 1990); Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176, 181 (9th Cir. 1989).

TransPerfect's disagreement with the submission of the marking defense to the jury, and the effect its possible finding of failure to mark may have had on its damage award, does not meet this test.

6

A41

Further, even if the Court were to find that the marking defense should not have been submitted to the jury, or that no reasonable jury could have found as it did, the Court could not simply increase the damage award as TransPerfect suggests.  A new trial on damages would have to be held.  A new trial should be granted only when the verdict is contrary to the clear weight of the evidence, <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007), or errors in the jury instructions as a whole misled the jury, <u>see</u> <u>Experience Hendrix LLC v. Hendrixlicensing.com Ltd</u>, 762 F.3d 829, 847 (9th Cir. 2014).

Again, the Court finds that the marking defense was properly submitted to the jury with correct instructions, and that the jury's damage award was supported by the evidence, whether it was based on a finding of failure to mark or not.  The Court DENIES TransPerfect's motion on this point and declines to order a new trial.

B.    Motion to Amend the Judgment to Award Supplemental Damages, Ongoing Royalties and Pre-Judgment Interest (Docket No. 489)

1.    Supplemental Damages

TransPerfect moves to amend the judgment to grant it supplemental damages under 35 U.S.C. § 284[1] on the theory that the jury failed to award it compensation for infringement that

---

[1] This statute provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.

A42

United States District Court
For the Northern District of California

1  occurred after December 31, 2011.  Specifically, TransPerfect

2  contends that the jury's damage award of $1,006,002 failed to

3  account for its post-2011 damages.  During discovery, MotionPoint

4  failed to produce any financial records later than 2011.  As a

5  result, TransPerfect argues, the parties' experts were unable to

6  examine any post-2011 financial information and the jury could not

7  have included these damages in its verdict.

8      TransPerfect apparently did not move to compel the financial

9  information necessary to calculate the post-2011 damages;

10  therefore, if the jury was not presented with all of the necessary

11  evidence, the fault does not lie exclusively with MotionPoint.

12      TransPerfect's expert purported to reserve the right to seek

13  post-2011 damages after trial, and TransPerfect argues that it

14  "reserved the right in its complaint and again in its pretrial

15  statement to seek an accounting of all damages."  Docket No. 522,

16  TransPerfect Reply at 2.  TransPerfect's attempts to reserve these

17  rights do not empower it to take the question of damages from the

18  jury.  Damages are part of a trial by jury.  If TransPerfect

19  wished to bifurcate a portion of its damages for a separate, later

20  trial, it would have had to ask the Court to do so, or reached an

21  agreement to that effect with MotionPoint.  Or TransPerfect could

22  have sought to ask the jury to extrapolate post-2012 damages from

23  the pre-2012 financial records and analysis.

24      In fact, it is not even clear that the jury did not award

25  damages for the full period.  As noted above, the jury returned a

26  verdict for TransPerfect of $1,002,006, indicating that it had

27  used a four percent royalty rate in calculating that amount; the

28  verdict amount is four per cent of about twenty-five million

8

A43

dollars, a number not argued by either side.  The verdict form

asked the jury, "[W]hat total damages do you find for

TransPerfect, if any?"  Docket No. 415, Verdict at 3 (emphasis

added).  The jury reached a damages verdict within the range

propounded by the experts' testimony.  It may have extrapolated

MotionPoint's infringing sales for the full period but found them

to be less than TransPerfect's expert suggested.  The Court cannot

award additional pre-verdict damages on its own at this point.

In similar circumstances, other courts have refused to award

supplemental pre-verdict damages.  In Presidio Components Inc. v.

American Technical Ceramics Corp., for instance, a court in the

Southern District of California found,

> The jury is presumed to have compensated Presidio
> for all of its lost profits leading up to the
> trial.  During trial, Presidio could have -- but
> did not -- argue to the jury that its suggested
> amount of $1,048,000 should be proportionally
> increased for the two months not accounted in the
> sales data.  Under these circumstances, awarding
> additional amounts of damages incurred before
> trial would be an improper invasion of the jury's
> province to determine actual damages and an
> inappropriate use of 35 U.S.C. § 284 to enhance
> inadequate compensatory damages.

2010 WL 3070370, at *2 n.1 (S.D. Cal.) (quotation marks and

citations omitted), aff'd in relevant part, vacated in part on

other grounds 702 F.3d 1351 (Fed. Cir. 2012).

A judge in this district recently relied on Presidio

Components in reaching the same conclusion.  Apple Inc. v. Samsung

Elecs. Co., Ltd., 926 F. Supp. 2d 1100, 1104 (N.D. Cal. 2013).

The court in that case refused to grant supplemental pre-verdict

damages because, "[w]hile it [was] true that the jury did not hear

**United States District Court**
For the Northern District of California

9

A44

**United States District Court**
For the Northern District of California

1   evidence of sales between June 30 and August 24, it [was] also

2   possible that the jury considered this fact in arriving at its

3   ultimate award."  Id.; see also Oscar Mayer Foods Corp. v.

4   Conagra, Inc., 869 F. Supp. 656, 668 (W.D. Wis. 1994) ("The Court

5   finds no justification for awarding additional damages for that

6   period of time prior to trial for which plaintiff offered no

7   evidence of lost profits."), aff'd 45 F.3d 443 (Fed. Cir. 1994).

8       These district court decisions are consistent with Federal

9   Circuit precedent, which holds, "Damages cannot be enhanced to

10  award the patentee additional compensation to rectify what the

11  district court views as an inadequacy in the actual damages

12  awarded."  Beatrice Foods Co. v. New England Printing &

13  Lithographing Co., 923 F.2d 1576, 1579 (Fed. Cir. 1991).  The same

14  principles militate against awarding supplemental pre-verdict

15  damages here.  TransPerfect's request is denied.

16          2.   Post-Verdict Damages

17      However, TransPerfect is entitled to recover its damages for

18  infringement that occurred after the verdict was returned in July

19  2013.  Under recent Federal Circuit case law, the Court could

20  award damages for post-judgment infringement at a royalty rate

21  higher than the one used by the jury.  Amado v. Microsoft Corp.,

22  517 F.3d 1353, 1361 (Fed. Cir. 2008) ("There is a fundamental

23  difference, however, between a reasonable royalty rate for pre-

24  verdict infringement and damages for post-verdict infringement.").

25  TransPerfect's expert has opined that the reasonable post-judgment

26  royalty rate is higher than four percent.  Docket No. 294-3 (filed

27  under seal), Hoffman Declaration at ¶¶ 26-35.  MotionPoint's

28  expert disagrees.

TransPerfect's expert relies largely on the fact that, after judgment, the patent has been determined to be valid and infringed. However, the jury was instructed that a reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began. It was to assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement, and that both parties believed the patent was valid and infringed. The jury found that a reasonable royalty rate was four percent based on TransPerfect's expert's testimony. The Court is not persuaded by his post-judgment opinion that the rate should be different, and finds that TransPerfect is entitled to a post-verdict royalty calculated at four percent, from the date of the verdict until a permanent injunction goes into effect and the infringement ceases.

        3.   Pre-Judgment Interest

In addition to compensatory damages, the prevailing party in a patent infringement suit is entitled to recover "interest and costs as fixed by the court." 35 U.S.C. § 284. Courts are afforded discretion to decide the interest rate to be used. Studiengesellschaft Kohle, m.b.H. v. Dart Indus. Inc., 862 F.2d 1564, 1580 (Fed. Cir. 1988). MotionPoint does not dispute that TransPerfect is entitled to both pre-judgment and post-judgment interest. Post-judgment interest was awarded in the judgment and is calculated under 28 U.S.C. § 1961. MotionPoint disputes TransPerfect's claim that pre-judgment interest should be

United States District Court
For the Northern District of California

11

A46

1  calculated at the prime interest rate and compounded quarterly.

2  MotionPoint contends that pre-judgment interest should instead be

3  calculated in the same manner as post-judgment interest, based on

4  the (lower) United States Treasury Bill rate, and compounded

5  annually.

6       Courts are divided on which of these methods is most

7  appropriate for calculating pre-judgment interest in patent

8  infringement suits.  Accordingly, because TransPerfect has not

9  presented any compelling reasons to deviate from the method used

10  to calculate post-judgment interest, the parties shall calculate

11  pre-judgment interest based on the Treasury Bill rate and annual

12  compounding.

13       C.   Motions for Entry of Judgment and a Permanent
              Injunction, and to Amend the Permanent Injunction
14            (Docket Nos. 440 and 489)

15       In its first set of post-trial briefs, TransPerfect moved for

16  entry of judgment and for a permanent injunction barring

17  MotionPoint from continuing to infringe or supporting infringement

18  of TransPerfect's Scanlon patent.  MotionPoint opposed the motion

19  for an injunction on the grounds that it was unwarranted, and that

20  TransPerfect's proposed injunction, which MotionPoint alleges

21  would prevent it from using its entire TransMotion system, was

22  overbroad.

23       The Court entered judgment and a generically-worded

24  injunction on November 15, 2013, Docket Nos. 467, 468.  The Court

25  stayed enforcement of the injunction pending resolution of the

26  parties' post-trial motions, which were to include briefing on the

27  language of any permanent injunction.  Thus, TransPerfect's pre-

28

United States District Court
For the Northern District of California

12

A47

Case: 15-1165    Document: 27    Page: 133    Filed: 02/25/2015

Case4:10-cv-02590-CW   Document544   Filed11/13/14   Page13 of 24

**United States District Court**
For the Northern District of California

judgment motion for judgment and an injunction, Docket No. 440, has been granted.

Three days after the Court entered and stayed its injunction, the Federal Circuit issued its decision in Apple Inc. v. Samsung Elecs. Co., Ltd., 735 F.3d 1352 (Fed Cir. 2013) (Apple III), making clear that the requirement of a causal nexus between the infringing products and the profits of the infringer applies in the permanent injunction context, as well as on a motion for a preliminary injunction. Id. at 1363-64 ("Accordingly, we reject Apple's arguments and confirm that the district court was correct to require a showing of some causal nexus between Samsung's infringing conduct and Apple's alleged harm."). Quoting an earlier decision in the same case, the Apple III court explained the purpose of the causal nexus requirement:

> Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product. Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct.

Id. at 1360 (quoting Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1324 (Fed. Cir. 2012) (Apple I)).

Thus, the court held, while the patentee need not "show that a patented feature is the exclusive reason for consumer demand," it must nevertheless show "some connection between the patented feature and demand for [the accused] products." Id. at 1364 (emphasis in original) (rejecting the district court's finding

13

A48

**United States District Court**
For the Northern District of California

1  that the patentee must "show that one of the patented features is

2  the sole reason consumers purchased [the accused product]").

3      The Federal Circuit offered three examples of evidence that a

4  patentee might present to establish this connection.  It

5  mentioned, for instance, "evidence that a patented feature is one

6  of several features that cause consumers to make their purchasing

7  decisions," "evidence that the inclusion of a patented feature

8  makes a product significantly more desirable," and "evidence that

9  the absence of a patented feature would make a product

10 significantly less desirable."  Id.

11     In its post-judgment briefing, TransPerfect moved to amend

12 the injunction, Docket No. 489, and MotionPoint responded that the

13 injunction should not have entered, and that it was overbroad.

14 MotionPoint argues that TransPerfect has failed to establish the

15 requisite "causal nexus" between the infringing components of

16 MotionPoint's TransMotion system and the profits MotionPoint

17 derives from that product.

18     TransPerfect identifies evidence in the trial record

19 establishing that such a nexus exists.  TransPerfect highlights

20 evidence presented at trial to establish a connection between the

21 infringing components of MotionPoint's TransMotion system and

22 consumer demand for that product.  In particular, it points to the

23 testimony of MotionPoint's Director of Software Development,

24 Eugenio Alvarez, who testified that the "implicit navigation" and

25 "single-action translation" features of the TransMotion system --

26 the allegedly infringing components -- were integral parts of the

27 system.  Trial Tr. 387:13-22; 514:22-23 (noting that the

28 TransMotion system would be "impossible to use if you didn't have

14

A49

implicit navigation").  In the context of head-to-head competitors in a crowded field, the Court finds the evidence at trial adequate to establish a causal nexus between the infringing features and the profit to MotionPoint and concomitant harm to TransPerfect.

The traditional requirements for a permanent injunction are also met.  The four factors that the Supreme Court requires a plaintiff to show to justify an injunction in the patent infringement context are

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).

Here, TransPerfect and MotionPoint are in direct competition with each other.  Neither TransPerfect nor its predecessor in interest had chosen to license the patent.  The royalty rate that a willing licensor would charge would not be adequate in this situation, and the correct rate would be difficult to calculate and enforce.  TransPerfect has shown irreparable harm from the uncompensated infringement and, while MotionPoint will be harmed by being barred from continuing to use the invention free of charge, the balance of hardships clearly tips in TransPerfect's favor.  The injunction has been stayed for a lengthy period, which should have allowed MotionPoint to design around the patent.  There is no reason to believe that the public would be disserved by an injunction.  Thus, the Court finds that a permanent injunction is appropriate.

15

A50

United States District Court
For the Northern District of California

1   TransPerfect moves to amend the injunction by expanding it to

2   (1) bind those in "acting in concert" with MotionPoint; (2) enjoin

3   MotionPoint against indirect infringement, and (3) require

4   MotionPoint to provide notice of the injunction to its customers.

5   MotionPoint opposes an injunction that would affect its existing

6   customers, arguing that only future infringing sales and uses

7   should be enjoined.  The Court has no wish unnecessarily to paint

8   MotionPoint as an infringer in the market, or to worry its

9   customers.  However, MotionPoint's business model involves

10  continuing, remunerative relationships with its customers.  It may

11  not continue to profit from these relationships while still

12  infringing.  MotionPoint has had ample time to design around the

13  Scanlon patent and to provide the new technology to its customers.

14  If it has not already done so, it must desist infringement within

15  fourteen days of the entry of the injunction.

16      The Court will enjoin those acting in concert with

17  MotionPoint, and will enjoin MotionPoint against indirect

18  infringement.  However, MotionPoint will not at this time be

19  required to notify its customers of its infringement.  If

20  MotionPoint is later found in contempt, the Court will order

21  notice to its customers.

22      E.    Motion for JMOL that MotionPoint Indirectly Infringes
            (Docket No. 489)
23

24      At trial, TransPerfect prevailed on all of its claims for

25  direct infringement but not on those for indirect infringement.

26  In particular, the jury found for MotionPoint on TransPerfect's

27  claims for inducement of infringement and contributory

28

16

A51

1  infringement.  TransPerfect now moves for JMOL in its favor on

2  these two claims.

3      The jury was correctly instructed that it could find

4  contributory infringement if MotionPoint supplied an important

5  component of the infringing part of the product or method, not

6  suitable for non-infringing use, with the knowledge that the

7  component was especially made or adapted for use in an infringing

8  manner.  Inducing infringement, the jury was told, similarly

9  requires that MotionPoint knew that it was causing infringing

10  acts.  MotionPoint's state of mind--whether it believed it

11  infringed TransPerfect's patent--was a hotly disputed question of

12  fact that was clearly one for the jury.  The jury heard the

13  evidence and the instructions and reached its verdict.  The Court

14  cannot say that the evidence permitted only the conclusion that

15  MotionPoint knew that it was infringing, or that the jury was

16  unreasonable in finding otherwise.

17      F.   Motion for Attorneys' Fees (Docket No. 489)

18      In a patent infringement action, a court may award the

19  prevailing party's attorneys' fees "in exceptional cases."  35

20  U.S.C. § 285.  The Supreme Court, in construing this section, has

21  held that

22          an "exceptional" case is simply one that stands out from
23          others with respect to the substantive strength of a party's
            litigating position (considering both the governing law and
24          the facts of the case) or the unreasonable manner in which
            the case was litigated.  District courts may determine
25          whether a case is "exceptional" in the case-by-case exercise
            of their discretion, considering the totality of the
26          circumstances.

27

28

A52

Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749, 1756 (2014).[2]

TransPerfect contends that it is entitled to attorneys' fees because MotionPoint engaged in litigation misconduct, asserted objectively baseless counterclaims, and brought those counterclaims in bad faith. However, the Court is not persuaded that MotionPoint asserted objectively baseless claims against TransPerfect. TransPerfect initiated this action and, although MotionPoint asserted counterclaims in response, those counterclaims were not objectively baseless.

In alleging litigation misconduct, TransPerfect contends that MotionPoint engaged in abusive discovery tactics, violated this Court's order on motions in limine, violated the parties' confidentiality agreement by disclosing settlement-related communications to the Court, opposed TransPerfect's disqualification motion in bad faith, made false statements and elicited false testimony at trial, and raised frivolous arguments throughout the litigation. Most of the behavior that TransPerfect has identified falls short of conduct justifying an award of attorneys' fees.

_____

[2] In so deciding, the Court observed that, construing similar language in the Copyright Act, it had provided a non-exclusive list of factors that district courts could consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Octane Fitness, 134 S.Ct. at 1756 n.6 (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)).

A53

United States District Court
For the Northern District of California

1    MotionPoint's alleged discovery abuses, for instance, do not
2    appear to have been committed in bad faith, and its alleged mis-
3    statements of fact and disclosures of confidential information
4    were relatively minor.  Likewise, MotionPoint's opposition to
5    TransPerfect's disqualification motion was not entirely without
6    merit, and its alleged failure to comply with the Court's order on
7    motions in limine appears to have been inadvertent.  MotionPoint
8    has asserted some frivolous arguments and filed some frivolous
9    motions during this litigation.[3]  Nonetheless, the Court exercises
10   its discretion to DENY the motion for attorneys' fees.

11   II.   MotionPoint's Motion for JMOL (Docket No. 486)

12       MotionPoint moves for JMOL on all of the claims that it lost
13   at trial, including TransPerfect's claims of direct infringement
14   and invalidity, as well as its own counterclaims for infringement
15   and invalidity against TransPerfect.  The Court is not persuaded
16   that the jury's verdict should be set aside.

17       A.   Claims 26 and 27

18       MotionPoint first argues that claims 26 and 27 of
19   TransPerfect's Scanlon patent are invalid and that this requires
20   that the jury's damages award must be vacated.  MotionPoint argues
21   that these means-plus-function claims are indefinite because the
22   required structure is not adequately disclosed.  MotionPoint would
23   "need[] to prove, by clear and convincing evidence, that the
24   specification lacks adequate disclosure of structure to be

25       [3] See, e.g., Docket No. 502, Motion to Strike (moving to
26   strike TransPerfect's motion for attorneys' fees as untimely even
     though the Court had specifically extended TransPerfect's deadline
27   to file this motion); Docket No. 504, Motion to Shorten Time
     (moving to shorten time on frivolous motion to strike).
28

A54

1  understood by one skilled in the art as able to perform the

2  recited functions."  <u>Intel Corp. v. VIA Techs., Inc.</u>, 319 F.3d

3  1357, 1366 (Fed. Cir. 2003).  This theory was belatedly disclosed

4  and TransPerfect argues that MotionPoint's motion should be denied

5  for this reason alone.

6      Be that as it may, the Court finds that MotionPoint has not

7  met its burden to show that the claims are indefinite, and that

8  TransPerfect points to sufficient structure to support these

9  claims.[4]  Furthermore, even if these claims were indefinite, the

10  jury found infringement of four additional claims and there would

11  be no reason to set aside the damages verdict or the injunction on

12  this ground.

13      B.   Claims 11, 17, 23, and 24

14      MotionPoint next argues that it does not directly infringe

15  the asserted claims of the Scanlon patent.

16      First, it raises a claim construction argument: that the

17  patentee disavowed all "single action translation components" that

18  do not remain visible before, during and after an electronic

19  communication is translated.  TransPerfect responds that this

20  argument too is untimely.  Nonetheless, the Court is not persuaded

21  by MotionPoint's argument.  No such disavowal was made, and

22  substantial evidence supported the jury's implicit finding that

23

24  _____

25      [4] The recent United States Supreme Court case on
indefiniteness does not affect this analysis.  <u>See</u> <u>Nautilus, Inc.</u>

26  <u>v. Biosig Instruments, Inc.</u>, 134 S.Ct. 2120 (2014).  Its new
teaching on non-patentable subject matter might be on point but

27  that issue was not raised in this case.  <u>See</u> <u>Alice Corp. Pty. Ltd.</u>

28  <u>v. CLS Bank Int'l et al.</u>, 134 S.Ct. 2347 (2014).

**United States District Court**
For the Northern District of California

20

A55

MotionPoint's single action translation component infringed the
Scanlon patent.

Second, MotionPoint disputes the jury's verdict of direct
infringement, other than by its own website.  TransPerfect points
to adequate evidence to support the jury's verdict.  MotionPoint
provides translated webpages that contain single action
translation components to be displayed to users.  This satisfies
the "displaying" limitation of the claims.  MotionPoint also
performed the "clicking" step by testing and demonstrating the
single action translation component for customers.  Further,
MotionPoint uses the system claims to make, use and sell its
TransMotion product.  TransPerfect provides numerous record cites
to this evidence.  In particular, MotionPoint contractually binds
its customers to place hyperlinks of the single action translation
component on their web sites.  Trial Tr. 745:15-746:14.
MotionPoint also controls the implicit navigation component of the
system, in that its servers "automatically redirect all links in a
page to the [TransMotion] servers as the page is being translated.
This has the effect of automatically translating any link page
when a user clicks on its link on the translated page."  Trial Tr.
387:19.  Substantial evidence demonstrated that MotionPoint
"obtains benefits" in the form of revenues from the system.

MotionPoint need not exercise physical or direct control over
each individual element of the system in order to bear vicarious
liability for direct infringement.  Instead, TransPerfect's
evidence supported that MotionPoint used the system by putting the
invention into service, controlling the system as a whole and

A56

1  obtaining benefit from it.  Cf. Centillion Data Sys., LLC v. Qwest

2  Comm'n Int'l, Inc., 631 F.3d 1279 (Fed. Cir. 2011).

3        C.    Sufficiency of Evidence of Damages

4        MotionPoint argues that the damages awarded against it are

5  excessive.  Its trial expert proposed a lump sum royalty based

6  upon the sale price of the patent at issue.  TransPerfect's expert

7  proposed a four percent running royalty and supported it with his

8  analysis.  MotionPoint now essentially raises an untimely Daubert-

9  type challenge to TransPerfect's expert's methodology.  See

10  Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993).

11        Even had it been timely, MotionPoint's challenge is

12  unavailing.  Having heard his full testimony and cross-

13  examination, as well as that of MotionPoint's opposing expert, the

14  Court finds that TransPerfect's expert's testimony was

15  sufficiently reliable and relevant to present to the jury.  His

16  testimony also provided substantial evidence from which the jury

17  could have made its damages award, an amount between those

18  advocated by the two experts.  It was within the jury's province

19  to do so.

20        D.    MotionPoint's Infringement Claims

21        In addition, MotionPoint argues that it is entitled to JMOL

22  that, in spite of the jury's findings of anticipation, obviousness

23  and statutory bar, its patents are valid.  The Court will not

24  summarize and analyze all of the evidence and arguments presented

25  on these points.  Suffice it to say that MotionPoint has failed to

26  show that no reasonable jury could have found against it on any of

27  these invalidity claims, much less all of them.  MotionPoint also

28  contends that TransPerfect infringes its patents as a matter of

22

A57

law.  Given that the patents have been found invalid on multiple

grounds, TransPerfect's claimed infringement would appear to be a

moot point.  Nonetheless, the Court finds sufficient evidence to

support the jury's verdict.

     E.   Validity of Scanlon Patent

     MotionPoint argues that TransPerfect's Scanlon patent is

invalid as a matter of law because it is obvious in the light of

the Flanagan patent.  MotionPoint needed to prove by clear and

convincing evidence that the Flanagan patent disclosed all of the

limitations of the asserted claims of the Scanlon patent.  Its

expert did not testify to a single action translation component in

Flanagan.  Trial Tr. 1015:22-1016:3.  TransPerfect's expert

testified that the Flanagan patent did not disclose this feature,

or the "implicit navigation" feature.  Trial Tr. 1194:1-1197:19.

There was evidence that the language upon which MotionPoint relied

to argue that it did was added after the priority date for the

Scanlon patent.  The jury properly considered the issue and its

verdict was reasonable.

<div align="center">CONCLUSION</div>

     For the reasons set forth above, the Court DENIES

TransPerfect's post-trial motion to sever the Lakritz patent

claims from the remainder of the case.  (Docket No. 445).  The

Court has GRANTED TransPerfect's post-trial motion for entry of

judgment and a permanent injunction (Docket No. 440) and has

entered judgment and a permanent injunction, albeit staying the

injunction.  TransPerfect's post-trial JMOL motion regarding

marking and its alternative request for a new trial on damages

(Docket No. 439) is DENIED.  TransPerfect's post-judgment motions

<div align="center">23</div>

<div align="center">A58</div>

United States District Court
For the Northern District of California

are GRANTED IN PART with regard to amending the injunction, and post-verdict royalties and pre-judgment interest, although not at the requested rate.  (Docket No. 489).  The Court will enter an amended injunction and the amended injunction will take effect fourteen days from the date it is entered.  TransPerfect's motions are otherwise DENIED.

MotionPoint's Motions for JMOL (Docket Nos. 444 and 486) are DENIED.

Within fourteen days of the date of this order, the parties shall submit joint or separate calculations of the amount of post-verdict royalties due, in accordance with the findings in this order.

IT IS SO ORDERED.

Dated:  November 13, 2014

CLAUDIA WILKEN
United States District Judge

A59

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TRANSPERFECT GLOBAL, INC.,                    No. C 10-2590 CW
TRANSPERFECT TRANSLATIONS
INTERNATIONAL, INC., and                      FIRST AMENDED
TRANSLATIONS.COM, INC.,                       JUDGMENT

       Plaintiffs,

    v.

MOTIONPOINT CORPORATION,

       Defendant.
_____/

    This action came on for trial before the Court and a jury,
Honorable Claudia Wilken, United States District Judge, presiding,
and the issues having been duly tried and the jury having duly
rendered its verdict, and this Court having previously issued its
Order Regarding Cross-Motions for Claim Construction and Summary
Judgment and its Order on Post-Trial Motions,

    IT IS ORDERED AND ADJUDGED

    That judgment be entered in favor of Plaintiffs TransPerfect
Global, Inc., TransPerfect Translations International, Inc., and
Translations.com, Inc. (collectively, TransPerfect Plaintiffs) on
their claims for infringement of their U.S. Patent No. 6,857,022;

    That TransPerfect Plaintiffs recover from Defendant
MotionPoint Corporation the sum of $1,002,006, with interest
thereon as provided by 28 U.S.C. § 1961 from the date of the
verdict until the judgment is satisfied, and their costs of action;

    That TransPerfect Plaintiffs recover from Defendant
MotionPoint Corporation a royalty at the rate of four percent on

1  all infringing sales made after the date of the verdict, in an

2  amount to be calculated separately;

3      That judgment be entered in favor of the TransPerfect

4  Plaintiffs on their claims for declarations of invalidity;

5      That claims 16 and 18 of MotionPoint's U.S. Patent No.

6  7,627,479, claims 32 and 34 of MotionPoint's U.S. Patent No.

7  7,580,960, and claims 12 and 19 of MotionPoint's U.S. Patent No.

8  7,627,817 are hereby declared invalid;

9      That judgment be entered in favor of MotionPoint on its

10  counterclaims declaring that it does not infringe TransPerfect's

11  U.S. Patent Nos. 7,207,005 and 6,526,426.

12      That MotionPoint shall take nothing on its infringement

13  counterclaims.  A permanent injunction will enter separately.

14      Dated at Oakland, California, this 13th day of November 2014.

15

16

17

18  CLAUDIA WILKEN
   United States District Judge

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

A61

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSPERFECT GLOBAL, INC., TRANSPERFECT TRANSLATIONS INTERNATIONAL, INC., and TRANSLATIONS.COM, INC., | No. C 10-2590 CW<br><br>AMENDED PERMANENT INJUNCTION |
| Plaintiffs, | |
| v. | |
| MOTIONPOINT CORP., | |
| Defendant. | |

On July 12, 2013, a jury returned a verdict finding that Defendant MotionPoint Corporation had directly infringed claims 11, 17, 23, 24, 26 and 27 of U.S. Patent No. 6,857,022 and the Court has ruled on Plaintiffs' post-trial motions.

Accordingly, the Court hereby enjoins and restrains MotionPoint Corporation and its officers, agents, servants, employees, successors, and assigns, and those knowingly acting in concert with them with notice of this injunction, from making, using, offering for sale, or selling in or importing into the United States any product that infringes, directly or indirectly, claims 11, 17, 23, 24, 26 and 27 of U.S. Patent No. 6,857,022.

MotionPoint's compliance with this injunction is stayed for fourteen days from the date of this orders.  The Court retains jurisdiction to modify or clarify this injunction.

IT IS SO ORDERED.

Dated: November 13, 2014

CLAUDIA WILKEN
United States District Judge

US006857022B1

## (12) United States Patent

Scanlan

(10) Patent No.: **US 6,857,022 B1**

(45) Date of Patent: **Feb. 15, 2005**

(54) **TRANSLATION ORDERING SYSTEM**

(75) Inventor: **Phillip Lee Scanlan**, Brisbane (AU)

(73) Assignee: **Worldlingo.com PTY LTD** (AU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 647 days.

(21) Appl. No.: **09/676,690**

(22) Filed: **Sep. 29, 2000**

(30) **Foreign Application Priority Data**

Feb. 2, 2000   (AU) ............................................. PQ5397

(51) Int. Cl.$^7$ ........................................... **G06F 15/16**

(52) U.S. Cl. ...................... **709/229**; 709/203; 709/226; 704/3; 704/6; 704/7

(58) Field of Search ................................ 709/200, 203, 709/225, 227, 229, 226; 704/3, 6, 7

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,323,310 A | * | 6/1994 | Robinson | 704/2 |
| 5,497,319 A | * | 3/1996 | Chong et al. | 704/2 |
| 5,903,760 A | * | 5/1999 | Farber et al. | 717/146 |
| 6,021,426 A | * | 2/2000 | Douglis et al. | 709/200 |
| 6,026,375 A | * | 2/2000 | Hall et al. | 705/26 |
| 6,119,078 A | * | 9/2000 | Kobayakawa et al. | 704/3 |
| 6,205,418 B1 | * | 3/2001 | Li et al. | 704/8 |
| 6,275,789 B1 | * | 8/2001 | Moser et al. | 704/7 |
| 6,360,273 B1 | * | 3/2002 | Beurket et al. | 709/244 |
| 6,600,725 B1 | * | 7/2003 | Roy | 370/261 |
| 2002/0091509 A1 | * | 7/2002 | Zoarez et al. | 704/6 |

### FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | 11282848 A | * | 10/1999 | G06F/17/28 |

* cited by examiner

*Primary Examiner*—Hosain Alam
(74) *Attorney, Agent, or Firm*—Madson & Metcalf

(57) **ABSTRACT**

A method of ordering a translation of an electronic communication, such as a web page or an email, using a one-click translation component displayed on the web page or in the email. Clicking the one-click translation component automatically requests a translation of the selected communication and returns the communication to the user. The method is controlled by a translation manager that obtains the translation and directs transmission of the translation to the user.

A single-click translation system for working the method is also described.

**28 Claims, 6 Drawing Sheets**



A63

U.S. Patent          Feb. 15, 2005          Sheet 1 of 6          US 6,857,022 B1



FIG 1



FIG 2

FIG 3

**U.S. Patent**        Feb. 15, 2005        Sheet 3 of 6        US 6,857,022 B1



FIG 4



FIG 5

Case4:10-cv-02590-CW   Document96-11   Filed10/13/11   Page6 of 13



FIG 6



FIG 7



Request for Information - Message (HTML)
File Edit View Insert Format Tools Actions Help
Send
Options...
To...
paul.avido@iquano.net
Cc...
Bcc...
Subject:
Request for Information
Dear Sir,
I am an investor interested in your industry, would you be able to send me a
copy of your annual report or a link to it online. If you are mailing it,
please email me and let me know it is on its way.
Thanks
Joe
Translate this Email
Traduzca este email a Españoles
Traduisez cet email en Français
Traduca questo email in italiano
Übersetzen Sie dieses email in Deutschen
Traduza este email em Portuguêses
Powered by Worldlingo.com

FIG 8

Request for Information - Message (Plain Text)
File Edit View Insert Format Tools Actions Help
Send
Options...
To...
paul.avido@iquano.net
Cc...
Bcc...
Subject:
Request for Information
Dear Sir,
I am an investor interested in your industry, would you be able to send me a
copy of your annual report or a link to it online. If you are mailing it,
please email me and let me know it is on its way.
Thanks
Joe
*************************TRANSLATE********************
* Traduzca este email a Españoles:
* http://www.worldlingo.com/wl/emails/en-sp/47929684-0
* Traduisez cet email en Français:
* http://www.worldlingo.com/wl/emails/en-fr/47929684-0
* Traduca questo email in italiano:
* http://www.worldlingo.com/wl/emails/en-it/47929684-0
* Übersetzen Sie dieses email in Deutschen
* http://www.worldlingo.com/wl/emails/en-ge/47929684-0
* Traduza este email em Portuguêses
* http://www.worldlingo.com/wl/emails/en-pt/47929684-0
********************************************************

FIG 9



15
DSTC Expert Seminars - Software Engineering
File Edit View Tools Message Help
Reply Reply All Forward Print Delete Previous Next Addresses Translator
From: Cathy Norris
Date: Thursday, 2 December 1999 14:04
To: Andrew Beattie
Subject: DSTC Expert Seminars - Software Engineering
The Technology and Sociology of Software Reuse Experiences of a Playing Coach
Tools and components are a necessary, but not a sufficient condition for
successful software. Software is built by humans, and not by the organizations
that use these tools. While little has been published, literature on a large
number of studies of software projects show that on-time completion and low
defect rates are substantially a function of individuals and how they work with
others. Dave describes his experiences both in the development of IBM's
products, and in working with customers, and highlight the critical factors for
building successful software.
Dave Thomas is founder of Object Technology International Inc (OTI). He has
over 30 years of experience in the computer industry as a developer, teacher,
professor, architect, project manager and director, president and CEO.

FIG 10

4
Translation Manager
21
Translation Server Database
20
Auto Responder
Customer Database
Translation Engines
24
22
Translation Stats Database
23

FIG 11

US 6,857,022 B1

1

**TRANSLATION ORDERING SYSTEM**

This invention relates to a method and system for ordering a translation via a communications network. In particular, it relates to a "one-click" ordering system for obtaining an "instant" translation of a web page, electronic mail or other electronic communication.

BACKGROUND TO THE INVENTION

The Internet is an international communications network that links computers all over the world. Individuals and businesses can access the Internet for exchange of information and conduct of business. New ways of utilizing the Internet are being launched virtually every day but most rely on exchange of information via established protocols and services such as electronic mail and the World Wide Web.

The World Wide Web (WWW or the Web) facilitates exchange of graphical and textual information by transmitting web pages from a server computer to a client computer. Each page, or part of a page, is typically stored in a file. Each file or collection of files is considered as a resource which can be located by a unique identifier known as a Universal Resource Locator (URL). When the URL is known the corresponding resource can be requested, located and displayed on the client computer using a protocol such as HyperText Transfer Protocol (HTTP).

The URL is also important for creating links between web pages. Web pages are generally written using HyperText Markup Language (HTML). HTML provides a standard set of commands and functions that define how a web page will display. A URL can be embedded in a web page as an active link to be followed by, for example, clicking on the link. By "clicking" is meant positioning a mouse pointer over the link and pressing one of the mouse buttons. Conventionally the left mouse button is pressed to follow a link and the right mouse button (when available) is used to choose from a menu of options.

The Web and the Internet have become almost ubiquitous in world-wide availability. As a result, new modes of business and information exchange have developed. It is now possible to purchase a wide range of products via the Web. It is also possible to communicate almost instantly to almost anywhere in the world using the Internet.

The only substantial barrier to global trade is language difference. The problem of language has been addressed by web sites dedicated to providing electronic and/or human translations of electronic communications. A communication processing system that provides transparent translation of electronic communications is described in co-pending International application number PCT/AU00/00783, filed by the present applicant.

Apart from the system described in the co-pending application, there are numerous web sites dedicated to providing electronic translation. Universally, these web sites require a visit to the site and the making of an electronic request that defines the communication to be translated. Commercial sites often require the provision of billing information to authorize payment for the translation by the requester. These translation services are not user friendly since a large number of keystrokes are required by a user before the desired translation can be obtained. Furthermore, the process is time consuming whereas recent trends in web applications demand rapid response. It would be preferable to avoid the need to leave the site you are on and go to the translation site. This acts as a major disincentive to a purchaser who seeks a product from a foreign language web

2

page. Rather than complete all the steps necessary to obtain a translation of the web page, the potential purchaser will seek another web trader.

In order to overcome the language barrier a request for translation must be made as simple and expeditious as possible.

DISCLOSURE OF THE INVENTION

In one form, although it need not be the only or indeed the broadest form, the invention resides in a method of ordering a translation of an electronic communication including the steps of:

displaying simultaneously to a user:

at least part of said electronic communication; and

a one-click translation component, said translation component comprising an object identified as effecting a translation of said electronic communication;

said user clicking said one-click translation component to request translation of said electronic communication;

said one-click translation component requesting a translation of said electronic communication by transmitting said electronic communication, or an indicator of said electronic communication, to a translation manager;

said translation manager obtaining a translation of said electronic communication; and

said translation manager directing transmission of said translation of said electronic communication to said user.

The method may further include the step of ordering providing translation parameters such as the target language.

In a further form, the invention resides in a single-click translation ordering system comprising:

a one-click translation component displayed simultaneously with at least part of an electronic communication, said translation component comprising an object identified as effecting a translation of said electronic communication;

a translation manager in communication with said one-click translation component via a communication network, said translation manager obtaining a translation of said electronic communication in response to a user clicking said one-click translation component, and directing transmission of said translation of said electronic communication to the user.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a schematic of a translation ordering system;

FIG. **2** shows an example of a one-click explorer bar embodiment of a translation ordering component;

FIG. **3** shows an example of a tool bar embodiment of a translation ordering component;

FIG. **4** shows an example of a context menu embodiment of a translation ordering component;

FIG. **5** shows a further example of a context menu embodiment of a translation ordering component;

FIG. **6** shows other embodiments of translation ordering components;

FIG. **7** shows a translation ordering component for HTML email;

FIG. **8** shows another translation ordering component for HTML email;

FIG. **9** shows a translation ordering component for text email;

FIG. **10** shows an example of translation ordering component embodied for email translation; and

FIG. **11** is a block diagram of one embodiment of a translation manager.

US 6,857,022 B1

3

## DETAILED DESCRIPTION OF THE DRAWINGS

Referring to FIG. 1, there is shown a schematic of a translation ordering system. A customer 1 requests a web page 2 from a web server 3. The web server 3 sends the requested page 2 to the customer's Internet browser. The web page 2 is displayed by the browser and the customer 1 determines if a translation is required. If a translation is required it is requested with a single action, as described below. A number of different embodiments are described below for a one click component for performing the single action. Whatever the particular embodiment, the result is always similar.

Once the translation is requested by a single action, the web page, a selected part of the web page, the URL of the web page or other indicator is transferred 5 to a translation manager 4. It is not normally required to translate graphics so when transferring the data to be translated the graphics may not usually be transferred. In this way bandwidth demands are not as great and the translation will be returned more quickly.

Bandwidth may also be reduced by recognizing that web pages consist of both static and dynamic content. For example, a news site will have static heading content but dynamic news content. The static content can be translated once and cached whereas the dynamic content must be translated each time a translation is requested.

Rather than transferring the web page, the URL or other indicator may be provided instead. In this case, the translation manager 4 will retrieve the original web page 6 from the web server 3.

The translation manager 4 processes the request by translating the text (and possibly sound, video, graphics etc.) and optionally adding further information. The translated web page 7 is transferred to the customer's browser and displayed in the requested language. The translation manager may also replace all links in the translated web page 7 with links that point to the translation manager 4. This enables the customer to surf an entire web site, or indeed many websites because often the links on a page are to other websites, without the need to separately request translation of each page. Once translation of one page is requested, linked pages may be automatically translated (either when the link is clicked or in advance) in anticipation of the customer's needs.

The single action to request a translation can be embodied in a number of ways. One example is shown in FIG. 2. FIG. 2 shows a screen shot of a web page 10 in English. At the bottom of the screen is an explorer bar 11 that implements a one-click translation component. The one-click component indicates that the page is to be translated from the current language, in this case English, to another language, which in this example is German. The user needs only direct a mouse pointer to the "GO" button and click once or select another language from the list, for the translation to be delivered by the translation manager.

The explorer bar may always be present in the browser window but may also be invisible until the user activates the translator plug-in button 12 on the tool bar. The button 12 may also be used to activate the one-click translation facility in any of the ways described later.

It will be noted that the 'from language' and 'to language' are contained in pull-down lists. This allows the user to select different translation options. Various other options can be selected with the "Edit Options" link 13. These options might include an area of specialty e.g. medical for medical

4

web pages, a specific dictionary, glossary, a specific translator (machine or human) to be used, the level of confidentiality required, the level of quality of the translation required, whether to edit or proof read, a time frame when the translation is required in the case of human translation, etc.

The amount of user interaction that is required will diminish through use. Once the options are set up there is only a requirement to click the one-click component to initiate the translation. It is anticipated that 'smart' icons will be employed that 'learn' user preferences through use thus further diminishing any need for user interaction other than through the one-click component.

Payment for the translation may be effected in one of many ways including:

(a) The owner of the web page may pay for all translations;

(b) The owner of the web page may pay a fee to be able to place the web translation component on that web page or part thereof.

(c) An advertiser may pay a fee to a web site owner to include the web translation component with the paid advertisement. The website owner may then pay this fee, or a part thereof, to the translation service that provides the translation component;

(d) The user may pay for the translation; or

(e) It may be free and supported by advertising and sponsorship.

If (d) applies, it will be necessary for the user to set up account details before the translation can be made. In the example shown in FIG. 2, (d) applies and the user will set up account details using the "Setup Account" link 14. To set up an account the client would be required to provided a variety of information which could include, but is not limited to:

Name;

Address;

Phone Number;

Fax number;

Email Address;

Preferred Password;

Security information that can be used to identify the user in case they forget their password;

Preferred payment method e.g. credit card, purchase order, bank transfer, etc;

Demographic information;

Information about the types of things that get translated e.g. medical industry, email, research reports etc;

Preferences regarding the nature of the translation e.g. formal, informal, business, etc;

Preferred quality level;

The level of editing and/or proof reading required;

Language pairs for which translation is required and the email address where each translation should be sent;

Preferred turnaround times;

Confidentiality Level;

Do not translate (DNT) lists

Customer specific dictionaries (CSD).

If (a) (b), (c) or (e) applies there is no action required by the customer other than to click once on the one-click translation component.

The explorer bar 11 is implemented as an Internet browser plug-in and therefore integrates with the users browser, such as Microsoft's Internet Explorer® or Netscape's Navigator®. Compared to prior art solutions, the explorer bar 11 has the unique ability to communicate with the web browser to gain access to the required details of the current web page. It can also allow saving options and preferences on the

US 6,857,022 B1

**5**

customer's local computer as well as supporting the translation of web pages or text selections by just one mouse click.

Prior art solutions require multiple mouse clicks to achieve the same result. Most often the customer is merely transferred to a common web page that is used for copy and paste translations at the translators web site. The language then has to be selected and the translation process started manually through the customer's interaction. The prior art approach requires an unacceptable number of actions by the user as well as time delays while waiting for web pages to load.

The translation manager **4** may store translation programs for effecting automatic translation of the identified web page. Alternatively, the translation manager may simply manage the process by transmitting the web page to another translation site. In this case the translated communication may be returned to the translation manager for transmission to the user or alternatively the translation manager may append routing information to the communication that directs the transmission of the translated communication to the user.

In some cases, a suitable translation engine will not be available and it will be necessary for the document to be translated by a human. This requirement will be notified to the customer by the translation manager and the translation process initiated or delayed until approved by the customer. The translation manager appends identifying data to the transmission in order to correctly return and display the translated material. The identifying data may include a job number that uniquely addresses a specific translation job.

The explorer bar **11** is only one embodiment of the one-click translation component. The content of the explorer bar **11** may be embodied as menu items in the customers' browser. For example, the tools menu of Microsoft's Internet Explorers may include a menu item as shown in FIG. **3** which allows selection of "Translate this page", or if text has been selected, "Translate selected text". The one-click translation component may also be a context menu as shown in FIG. **4**, activated by clicking the right mouse button to translate the page. If text has been selected the context menu will give the option to "Translate selection", as shown in FIG. **5**. Such components will be known to persons skilled in the art of programming for web pages.

Other embodiments, in the form of pull down lists, buttons and bars are shown in FIG. **6**. The webmaster (person responsible for construction and management of the web page) can include pre-built HTML and JavaScript code into their web pages to instantaneously enable a one-click translation component.

The banners and buttons of FIG. **6** are automated to provide a one-click component for requesting translation, ie. all the customer has to do to translate the current web page, email, or other form of electronic communication is select the target language. Because the encoding of the web page and the source language are already known and preset when the webmaster includes the one-click translation component, it is sufficient at this stage just to choose the target language. The translated page will still contain the one-click translation component, so another selection of a target language will invoke the process again.

Another embodiment could be a hypertext link that includes an indicator of the web page or other communication to be translated and an indicator of the language to be used for the translation. A web page could include a different hypertext link for each language and the user simply clicks on the appropriate link to initiate translation of the page into

**6**

the desired language. This embodiment is particularly useful for other forms of communication, such as text based email which do not support the full functionality of web pages but do support hypertext links.

Examples of a translation component embedded in the body of an HTML email are shown in FIG. **7** and FIG. **8**. FIG. **7** shows an object that incorporates the pull down menu object discussed earlier. FIG. **8** shows an alternative where the available translation options are listed in an object. FIG. **9** shows an embodiment in which translation links are placed in the body of a text email.

The one-click translation components may operate in a number of ways depending on the location of the email. If the email is stored on the local machine the one-click component operates to transmit the email to the translation manager. If the email is left on the server of the ISP, the one-click component may transmit an indicator of the email, such as a file location. Another possibility is that the email is stored on a server on a LAN, in which case either approach may be possible.

As mentioned above, and as will be appreciated by persons skilled in the use and programming of web pages and/or software, the described functions can be provided by plug-in applications or stand alone programs that interact either actively or passively with the viewed web pages (or data containers in software applications e.g. fields, memo fields, Blobs, documents, workbooks, windows, dialog boxes, record, etc.) and communicate with the translation manager via the Internet to request translation in response to a keystroke, mouse action, voice command, or other method by the customer.

As previously described, the one-click translation component is not restricted to operating in a web environment. For example it may also be embodied as an add-in for translation of electronic mail, as shown in FIG. **10**. The tool **15** appears on the tool bar of the email client e.g. Microsoft Outlook or Eudora. With a single action, such as the click of a mouse button, a customer may send a message to the translation manager **4** for translation and optionally forwarding to the intended recipient or returning to the requester. In this embodiment, the customer may save default account information as previously discussed.

The invention can be applied to virtually any software. In one embodiment, the inventor envisages that an icon (button) could be provided in one corner of the computer screen and operate directly within the operating system shell. When the item is clicked the active control or active window is sent to the translation manager for translation.

In another example an icon could be added to the tool bar of applications that commonly deal with documents like WINZIP. So when unzipping a file it is translated automatically with one click.

Another application applies to computer classifieds. Users could pay a small additional amount to have a translation component associated with the classified to encourage foreign language viewers to consider the classified.

In an extension of the one-click translation ordering system, the translation manager **4** maintains a database of statistical information about the requested translations. The statistical information is accessible by webmasters (and/or other approved parties) of web pages that have been translated in a similar way to how page visit information is currently available using cgi-bin. This statistical information provides hard data to the web site owner about which parts of their website should be translated and into which languages.

For example, if a travel website has a section on Port Douglas holidays that receives requests for translations into

US 6,857,022 B1

7

Japanese over a hundred times a day, it would be a clear indication to the website owner to have that part of their website professionally translated into Japanese. It may also affect the sites product mix. Based on this statistical data the website owner might include more Port Douglas destinations with Japanese speaking staff, menus, etc. than they had before.

The key benefit of this aspect of the invention is that it helps the website owner to make better business decisions based upon the actual language preferences of visitors to their website.

Another use for this statistical data is as a marketing tool. The statistical data can be used by a website localization business to convince a potential client to have their website localized into say Japanese. The data may also highlight other languages the website should be localized into thus helping to gain more business.

Yet another use of the statistical information is to determine the language preference of a user, so that it is possible to communicate in the users preferred language, irrespective of the source language. It has been found that people are three to four times more likely to initiate a purchase when communicated with in their native tongue. The ability to communicate with a potential customer in their preferred language can translate to a substantial increase in sales.

The statistical information could be used in a bureau service wherein a commercial or bulk email provides a list of email addresses for intended recipients. The addresses would be run against a database of user preferences and the recipients preferred language provided for each email. A customized translation component could then be included in the email and/or the message translated into the preferred language. The bureau would be able to charge a fee for this service.

The inventor perceives that the invention can be extended in this (and other) applications, to provide currency translations. The translation manager **4** may access current or historical currency exchange rates to convert fees and charges to a currency suitable for the user. For example, if a communication were being converted to Chinese all currency references would be converted to yen and the cost of the translation could be billed in yen, or any other suitable currency.

The one-click translation ordering system can form a key component of revenue sharing programs such as those commonly known on the internet as affiliate or associate programs. Under these programs, the site (and this can be extended to software packages on computers that are connected to the internet at least occasionally) offering the service or product for sale pays an amount of money to other sites who advertise or promote their service or product. This amount of money is calculated on a per impression basis (an amount for each time an advertisement such as a button, banner, or text description is displayed), a per click basis (an amount for each time someone clicks on the advertisement to visit the site offering the product or service), a per lead basis (an amount for each time a visitor clicks on an advertisement and fills out say an inquiry form), or a per sale basis (an amount for each time the visitor clicks on an advertisement and actually buys something from the site offering the product or service—this could be a fixed amount or a variable amount such as a percentage). These programs can be multi-tier i.e. each participant may get a share of the revenue derived from people they refer to join the affiliate program. They can be set up to only pay on sales generated on that particular visit, or for a fixed period after that visit, say 90 days, or for life.

8

A person skilled in the art would be aware of the myriad of ways these revenue sharing schemes can be set up. There are many variations in terms of how the revenue shared is calculated; what advertisements are available; what medium you can advertise on e.g. web pages, emails, newsletters, brochures, newsgroups, software, signature files, etc.; and many other attributes of the program.

The one-click translation ordering system when integrated with such a revenue sharing program has several advantages over competing offers in terms of the value it adds to the website in addition to the revenue sharing opportunities. The added value includes the statistical data that helps the web site owner determine which parts of the website should be localized into which languages based on actual demand from users. Research has found that a visitor is three to four times more likely to buy something from a site in their native language versus a non-native language, so the value added includes the increased sales that are likely to be generated by the site.

The one-click translation ordering system returns additional value to the owners of web pages that elect to embed a one-click translation component on their web page. Members of the affiliate program receive a commission statement indicating the number of translations made as well as recommendations on which pages should be permanently translated and into which languages. The inventor envisages that this facility can greatly enhance the effectiveness of web based marketing by the affiliate member.

The affiliate member may also receive a commission on translations paid for by their customers. This information is tracked by the translation manager **4**.

One possible embodiment of the functional components of the translation manager **4** is shown in FIG. **11**. As mentioned above, the translation manager **4** may include translation engines **20** for performing the required translations. A database **21** of available translation servers may also be maintained and the translation manager **4** will direct requested translations to the appropriate server. It is also necessary for the translation manager **4** to maintain a customer database **22** for accounting purposes. Statistics on translations performed are maintained in another database **23** for internal management and affiliate program purposes. The translation manager **4** also includes an auto-responder **24** for sending messages to the customer and to webmasters of affiliate web page owners.

Throughout this specification the aim has been to describe the preferred embodiments of the invention without limiting the invention to any one embodiment or specific collection of features.

What is claimed is:

1. A method of ordering a translation of an electronic communication, the electronic communication comprising at least text of more than one word and one or more hyperlinks to further electronic communications, including the steps of:

displaying simultaneously to a user:

    at least part of said electronic communication; and

    a single action translation component, said single action translation component comprising an object identified as effecting a translation of said electronic communication in a single action;

said user clicking said single action translation component to request translation of at least said text of said electronic communication by transmitting said electronic communication, or an indicator of said electronic communication, to a translation manager; and

said translation manager:

US 6,857,022 B1

9

obtaining a translation of said electronic communication;

directing transmission of said translation of said electronic communication to said user; and

providing translation of said further electronic communications when said hyperlink is activated:

by delivering a translation of said further electronic communications that was translated when said electronic communication was translated; or

by obtaining a translation of said further electronic communications when said hyperlink is activated.

**2**. The method of claim **1** further including the step of said user providing translation parameters.

**3**. The method of claim **2** wherein said translation parameters include a target language.

**4**. The method of claim **1** wherein the step of transmitting involves transmitting one of: a URL of a web page; a selected part of a web page; or the web page.

**5**. The method of claim **1** wherein clicking said single action translation component transmits one of: an email; a part of an email; or a location of an email.

**6**. The method of claim **1** further including the step of said translation manager appending further information to said translation.

**7**. The method of claim **6** wherein said further information is identifying information for correctly returning said translation to said user.

**8**. The method of claim **1** further including the step of reducing bandwidth demands by recognizing content of said electronic communication as either static or dynamic content and caching translated static content for future use.

**9**. The method of claim **1** wherein said single action translation component comprises a smart icon capable of learning user preferences through use by said user.

**10**. The method of claim **1** further including the step of the translation manager translating currency amounts to equivalent amounts in a user currency.

**11**. The method of claim **1** further including the step of compiling statistical information about said translation manager.

**12**. The method of claim **1** further including the step of said translation manager maintaining user information.

**13**. The method of claim **1** further including the step of effecting payment for said translation.

**14**. The method of claim **13** wherein payment for said translation is effected by an originator of said communication paying a fee for displaying said single action translation component.

**15**. The method of claim **13** wherein payment for said translation is effected by an originator of said communication selling advertising space to an advertiser for a fee and paying said fee, or part of said fee, for displaying said single action translation component.

**16**. The method of claim **1** further including the step of caching translation of static content of said electronic communication or said further electronic communications.

**17**. A single-action translation ordering system comprising:

a single action translation component displayed simultaneously with at least part of an electronic communication comprising at least text of more than one word and one or more hyperlinks to further electronic communications, said translation component comprising an object identified as effecting a translation of said electronic communication in a single action;

10

a communication network; and

a translation manager in communication with said single action translation component via said communication network;

said translation manager:

obtaining a translation of said electronic communication in response to a user clicking said single action translation component;

directing transmission of said translation of said electronic communication to said user; and

providing translation of said further electronic communications when said hyperlink is activated:

by delivering a translation of said further electronic communications that was translated when said electronic communication was translated; or

by obtaining a translation of said further electronic communications when said hyperlink is activated.

**18**. The system of claim **17** wherein said single action translation component is selected from a list including: an explorer bar, a pull-down menu, context menu, or a button.

**19**. The system of claim **17** wherein said single action translation component comprises an add-in application for an electronic mail program.

**20**. The system of claim **17** wherein said single action translation component comprises an application operating within an operating system for translating communications within the operating system.

**21**. The system of claim **17** further comprising means for said user to input translation parameters.

**22**. The system of claim **17** wherein said translation manager includes means for effecting automatic translation of said communication.

**23**. The system of claim **17** further comprising means for compiling statistical information about said system.

**24**. The system of claim **17** further comprising means for translating currency amounts to equivalent amounts in a user currency.

**25**. The system of claim **17** further comprising means for maintaining user information.

**26**. A translation manager for a single action translation system, said translation manager comprising:

means for receiving an electronic communication in response to clicking a single action translation component displayed simultaneously with at least part of said electronic communication, the electronic communication comprising at least text of more than one word and one or more hyperlinks to further electronic communications, said translation component comprising an object identified as effecting a translation of said electronic communication in a single action;

one or more translation engines translating said electronic communication and said further electronic communications according to parameters; and

means for returning a translation of said electronic communication; and

means for returning a translation of said further electronic communications when said hyperlink is activated.

**27**. The translation manager of claim **26** further comprising means for compiling translation statistics.

**28**. The translation manager of claim **26** further comprising means for maintaining user information.

* * * * *

## <u>PROOF OF SERVICE</u>

The undersigned hereby certifies that on February 25, 2015, true and

correct copies of the foregoing OPENING BRIEF FOR DEFENDANT-

APPELLANT MOTIONPOINT CORPORATION were served via the

Court's CM/ECF system and/or via e-mail.  A list of those served appears

below.

DOUGLAS E. LUMISH
doug.lumish@lw.com
JEFFREY G. HOMRIG
jeff.homrig@lw.com
GABRIEL S. GROSS
gabe.gross@lw.com
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California 94025
Tel: (650) 328-4600; Fax: (650) 463-2600

JOSEPH. H. LEE
joseph.lee@lw.com
LATHAM & WATKINS LLP
750 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Tel: (714) 540-1253; Fax: (714) 755-8290

GABRIEL BELL
gabriel.bell@lw.com
LATHAM & WATKINS LLP
555 11th Street, NW
Washington, DC 20004
Tel: (202)-637-2200; Fax: (202) 637-2201

Respectfully submitted,

Dated:  February 25, 2015        By:  _____*/s/ Robert W. Stone*_____
                                      Robert W. Stone
                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
                                      555 Twin Dolphin Drive, 5th Floor
                                      Redwood Shores, California 94065
                                      Telephone: (650) 801-5000
                                      Facsimile: (650) 801-5100
                                      robertstone@quinnemanuel.com

                                      *Attorney for Defendant-Appellant*
                                      *MotionPoint Corporation*

# CERTIFICATE OF COMPLIANCE

Counsel for Appellant MotionPoint Corporation hereby certifies that:

1.    The brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7) permitting an opening brief of up to 14,000 words because, exclusive of the exempted portions, it contains 13,970 words as counted by the word processing program used to prepare the brief.

2.    The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared using Microsoft Office 2007 in a proportionally spaced typeface: Times New Roman, font size 14.

Respectfully submitted,

Dated:  February 25, 2015        By:        /s/ Robert W. Stone
                                            Robert W. Stone
                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                            555 Twin Dolphin Drive, 5th Floor
                                            Redwood Shores, California 94065
                                            Telephone: (650) 801-5000
                                            Facsimile: (650) 801-5100
                                            robertstone@quinnemanuel.com

                                            *Attorney for Defendant-Appellant
                                            MotionPoint Corporation*